280 N.J. Super. 349 (1995)
655 A.2d 461
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
EDWARD KADELAK, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 30, 1995.
Decided March 23, 1995.
*350 Before Judges VILLANUEVA, WEFING and BRAITHWAITE.
M. Daniel Cantor argued the cause for appellant (Mr. Cantor, on the brief).
Boris Moczula, Deputy Attorney General, argued the cause for respondent (Deborah T. Poritz, Attorney General of New Jersey, attorney; Mr. Moczula, of counsel; Mr. Moczula, and Valerie L. Egar, Deputy Attorney General, on the brief).
*351 American Civil Liberties Union of New Jersey, Amicus Curiae (Judith Levin, pro hac vice, of counsel and on the brief).
The opinion of the court was delivered by VILLANUEVA, J.A.D.
Defendant Edward Kadelak appeals from the Law Division order, after our remand, 258 N.J. Super. 599, 610 A.2d 916 (Kadelak I), upholding his conviction of violating N.J.S.A. 39:4-50 (DWI) and the constitutionality of N.J.S.A. 39:8-2, which mandates random roadside inspections annually of at least 1% of the motor vehicles registered in the State. The trial court concluded that the mobile inspection teams (MITs) utilized by the Division of Motor Vehicles (DMV) are constitutionally permissible. We affirm.
The facts of this case as they relate to defendant's motor vehicle stop are succinctly summarized in our first opinion wherein we stated:
On August 9, 1990, the Bordentown City Police and the State Division of Motor Vehicles (DMV) conducted a "roadside safety check" in which local police and a team of inspectors from the DMV stopped oncoming cars to conduct an inspection of the vehicle and the credentials of the operator. The particular roadblock under review was conducted on Park Street, which had been selected by the chief of police....
The officers on the roadway had been orally instructed by the police chief to stop every fifth vehicle as well as any vehicle with an obvious equipment violation, such as a broken headlight or cracked windshield, or an overdue inspection sticker. The vehicles stopped were directed over to the adjacent lot where the vehicle was inspected for "just about everything that would be checked in the motor vehicle inspection; tires, lights, horns, pollution  and documentation."
The roadside safety check was conducted from 9:00 a.m. to 3:00 p.m.... At approximately 10:30 a.m., defendant's pickup truck was stopped because it was a fifth car in the line.... Defendant was found to be intoxicated and was charged with DWI (N.J.S.A. 39:4-50). [His breathalyzer readings were .22 and .21 respectively].
[Kadelak I, 258 N.J. Super. at 600-601, 601 n. 2, 610 A.2d 916.]
Following an extensive procedural history involving defendant's motion to suppress evidence in the municipal court, which was denied despite his claim that N.J.S.A. 39:8-2 is unconstitutional *352 and that the stop therefore violated his constitutional rights, his plea of guilty to the DWI charge,[1] an appeal to the Law Division and this court, we remanded the matter to the Law Division to consider the balancing of the State's interest in conducting vehicle safety checkpoints of the type which resulted in defendant's stop and eventual DWI arrest against the intrusion of defendant's constitutional rights. We ultimately stayed defendant's sentence pending his appeal.
In our first opinion ordering a remand, we noted that
[n]o evidence was offered [by the State] in support of the reasons for random roadside inspections except for the existence of legislative authority. Further, no empirical data was submitted to assist in examining the balance between the intrusion on individual rights against the promotion of some legitimate governmental interest; for example, the frequency of vehicles which have passed inspection at a state facility but have been found, on roadside inspection, to have developed defects; or vehicles which have passed inspection at a private facility, notwithstanding defects found on roadside inspections.
[Kadelak I, supra, 258 N.J. Super. at 612, 610 A.2d 916.]

I.
On May 10th and 11th, 1993, when the trial court conducted an evidentiary hearing pursuant to our directive, the State presented the testimony of five witnesses: Mark Marino, Thomas Wright, Thomas Bednarz, Michael T. Klewin, and Robert E. Leonhardt. Marino, a DMV supervisor, testified as to the nature, history and overall function of the MITs. Wright presented a statistical and empirical analysis of the MITs' activities. Bednarz addressed DMV private inspection center audits, the results of covert investigations related thereto and the monitoring function served by MITs. Leonhardt, the MIT leader at defendant's stop, testified about characteristics and results of the August 9, 1990 MIT checkpoint. Klewin testified as to the federal Clean Air Act of *353 1970 (Clean Air Act or Act), 42 U.S.C.A. §§ 7401-7642, New Jersey's responsibilities under the Act and the role of MITs in relation thereto.
The trial judge found that for the years 1989, 1990, and 1991, the failure rates found by the MITs were substantially higher than the failure rates by State Inspection Centers (SICs) and Private Inspection Centers (PICs). The percentage of those failed by all the inspection centers due to credential violations in 1989 was 23%, in 1990 it was 20% and in 1991 it was 15%.
Although the judge noted that credential violations have little relation to highway safety, he found that the MITs also discovered various equipment violations. The judge found that the record supports the conclusion that a majority of violations would not be found unless vehicles were subjected to random roadside checks.
The judge "accept[ed] as implicit, for purposes of this case, that the physical condition of motor vehicles has some relation to highway safety and to the number and/or seriousness of motor vehicle accidents." However, the judge did note that there were no statistics presented to support this proposition, and set forth the issue as whether the incremental value of MIT inspections over SIC and PIC inspections in achieving motor vehicle safety represents such a significant State interest to justify the inevitable intrusion upon the fundamental freedoms of travel and privacy.
The judge noted that the State offered two fundamental reasons related to highway safety why MITs are constitutional. The first was that MITs monitor compliance with equipment standards because people will be more likely to keep their cars in good repair if they know there is a chance they will come upon a roadside check. The State urged that the higher failure rates at MIT inspections, as compared to SICs and PICs, is a result of people not repairing their cars until the inspection is due. The State next argued that MITs are part of the overall policy to monitor the honesty and thoroughness of SICs and PICs: "Logic dictates that, as in the case of any random spot check, quality assurance is improved." The court did concede, however, that no *354 statistics were presented to demonstrate how many cars that that passed at a SIC or PIC failed an MIT inspection, and thus the court could not quantify the effectiveness of the program.[2]
The State also offered a third reason, unrelated to highway safety, involving the broader public concern of complying with mandatory regulatory requirements set forth in the Clean Air Act. The judge noted that to achieve the air quality standards required by the Act, New Jersey must implement an enhanced inspection system for mobile sources of ground level ozone and carbon monoxide gases. The judge also noted that the contribution MITs make to clean air quality is undetermined, but there is a consensus among experts that vehicle inspection programs generally have a significant impact on air quality.
Although this type of roadside stop is a seizure and thus presumptively invalid, the judge posited that "on a scale of values which measures such intrusion against the significance of highway safety or the reduction of pollution in the air, in my judgment, the intrusion is constitutionally acceptable. It is, in fact, minimal."
The judge concluded that the State has a legitimate interest in the health, safety, and welfare of its citizens that is furthered by vehicle safety checkpoints, and the inclusion of the MIT program in the proposed State Implementation Plan (SIP), required by federal regulations, serves to reduce air pollution given that air pollution, to which vehicles are a major contributor, has been found to have a "significant impact on the public health." The judge in a written opinion dated October 19, 1993, again denied defendant's motion to suppress. The Law Division's order affirmed the conclusions set forth in the trial judge's two opinions and upheld the constitutionality of N.J.S.A. 39:8-2, and was ultimately signed on November 19, 1993.

*355 II.
On appeal defendant argues:
I. PURSUANT TO THE MANDATE OF STATE V. KADELAK, 258 N.J. SUPER. 599 [610 A.2d 916] (APP.DIV. 1992), THE STATE NEITHER PRESENTED EMPIRICAL DATA DEMONSTRATING THE EFFICACY OF THE CONSTITUTIONALLY INTRUSIVE MOBILE INSPECTION TEAM [MIT] ROADBLOCK NOR DID THE STATE PROVE THAT CUSTOMARY AND TRADITIONAL METHODS OF LAW ENFORCEMENT WERE DEFICIENT TO PROMOTE ROAD SAFETY.
II. THE POLICY OF DMV AND POLICE DEPARTMENTS IN NOT PUBLICIZING THE MIT ROADBLOCKS INCREASES CONSTITUTIONAL INTRUSIVENESS.
III. THE MIT ROADBLOCK IS HIGHLY INTRUSIVE CONSTITUTIONALLY.
IV. THE STATE PRESENTED HIGHLY FLAWED DATA.
V. PURSUANT TO STATE V. PIERCE, 136 N.J. 184, [642 A.2d 947] (1994), ARTICLE I, PARAGRAPH 7, OF NEW JERSEY'S CONSTITUTION AFFORDS GREATER PROTECTION THAN THE FOURTH AMENDMENT.
VI. THE OCTOBER 19, 1993 DECISION OF [THE TRIAL] JUDGE INCORRECTLY RELIES ON LESS PROTECTIVE OUT-OF-STATE AUTHORITY.
The amicus curiae additionally argues:
I. ROADBLOCKS ESTABLISHED TO UNCOVER MOTOR VEHICLE VIOLATIONS VIOLATE BOTH THE FOURTH AMENDMENT AND ARTICLE I, PARAGRAPH 7 OF THE NEW JERSEY CONSTITUTION.
II. THE MOBILE INSPECTION ROADBLOCK CONDUCTED ON AUGUST 9, 1990 FAILS TO MEET THE REQUIREMENTS ESTABLISHED IN STATE V. KIRK.

A. The time and location of this roadblock were selected on the basis of convenience, rather than on empirical data.

B. There was no advance general publicity of this roadblock.

C. There was no specified neutral and courteous procedure for the officers and MIT workers to follow during this roadblock.

III. MOBILE INSPECTION TEAMS AS IMPLEMENTED AT THE TIME DEFENDANT WAS STOPPED WERE NEITHER MANDATED, NOR A REASONABLE METHOD OF COMPLYING WITH THE CLEAN AIR ACT.
A. The adoption of New Jersey's State Implementation Plan (SIP) as a federal regulation does not mandate full-scale roadside vehicle inspections.

*356 B. Mobile Inspection Teams as implemented at the time of defendant's stop are not a reasonable approach to furthering the goals of the Clean Air Act.

In our first opinion we reviewed the legislative history of annual inspections and regulations adopted by the DMV. We noted that from the Assembly statement attached to 1983 legislation specifically authorizing random roadside inspections by amendment to N.J.S.A. 39:8-2, "it appears that at least one of the reasons for continuing the roadside inspection program was to check vehicles inspected by private inspection centers for the quality and thoroughness of their inspections." Kadelak I, 258 N.J. Super. at 610-11, 610 A.2d 916.
New Jersey has been a pioneer nationally in initiating motor vehicle inspection programs beginning in 1936. The first formal effort to inspect motor vehicles in the United States was a voluntary program initiated in Massachusetts in 1926. The following year, New York, Massachusetts and Maryland followed. In 1928, New Jersey, Delaware and Pennsylvania also adopted such voluntary programs. Report of the Motor Vehicle Inspection Commission to the Governor (Feb. 15, 1978) (1978 MVIC Report) at 51.[3]
A short time thereafter, the New Jersey Legislature decided to go further. L. 1931, c. 127 (see N.J.S.A. 39:8-1 and 2) provided the first specific statutory authority for a mandatory vehicle inspection program in the State. Implementation of the law was contingent upon the Governor's issuance of a proclamation to institute the program. However, the Governor never issued the necessary proclamation and, accordingly, no inspections were conducted under this law. 1978 MVIC Report at 51.
Five years later, a mandatory periodic vehicle inspection program with a few exceptions was finally enacted in New Jersey. L. 1936, c. 269 (see N.J.S.A. 39:8-1 and 2). However, this vehicle *357 inspection program, which actually began on January 10, 1938 (1978 MVIC Report at 51), established a State-run program which required the inspection of virtually all registered vehicles every six months. 1978 MVIC Report at 69.
By 1971, the strain on available resources became critical, necessitating the adoption of measures to relieve the burden on SICs. In conjunction with other changes, the Director of the DMV also established the MIT program to monitor the performance of vehicles subject to self-inspection. These MITs were established pursuant to the Director's authority to determine the frequency and character of motor vehicle inspections and to require vehicles to be inspected by designated examiners. N.J.S.A. 39:8-2.[4]
In the early 1970's there were two developments which impacted substantially upon the motor vehicle inspection program: the institution of a vehicle emissions testing program in 1972 and the enactment of a compulsory insurance law for motor vehicles in 1973 (N.J.S.A. 39:6B-1 to B-3).
The background to the creation of an emissions testing program is significant. In the 1950's and 1960's, the nation became increasingly aware of the problem of air pollution. In 1966, the New Jersey Legislature created the Department of Environmental Protection (DEP) and gave it extensive responsibility in the area of air pollution. Because research had determined that automobiles were a major contributor to air pollution, a law was passed which specifically required any motor vehicle subject to inspection by the DMV to pass an emissions test established by DEP. 1978 MVIC Report at 25; L. 1966, c. 15, § 1 (N.J.S.A. 39:3-70.1).
*358 DEP, through use of air monitoring devices installed at various State sites, determined that automobiles were the source of most of the carbon monoxide and a substantial portion of the oxidants in New Jersey's air. DEP began research to develop strategies to reduce automobiles' contribution to the air pollution problem. It found that both carbon monoxide and the hydrocarbons which lead to the formulation of oxidants could be measured in the exhaust at a vehicle's tail pipe. 1978 MVIC Report at 25-26.
The air pollution problem was also the subject of legislative activity at the federal level. Congress passed the Clean Air Act of 1970, which established the federal Environmental Protection Agency (EPA). The Clean Air Act focused upon the control of air pollutants which were known to negatively impact on public health. With regard to automobile emissions, the pollutants with the highest impact were found to be ground level ozone, volatile organic compounds, nitrogen oxides and carbon monoxide. The Act required the EPA to establish clean air standards and to assist individual states in achieving these standards. 42 U.S.C.A. §§ 7401-7642.
On July 1, 1972, New Jersey commenced, on an advisory basis, its first emissions testing program for motor vehicles. On February 1, 1974, New Jersey became the first state to institute a mandatory testing program, using the same test standards as the advisory program. 1978 MVIC Report at 34-35. On November 1, 1975, the test standards were changed to make them more stringent. 1978 MVIC Report at 35.
Although emissions testing was implemented in an effort to improve New Jersey's air quality, it had a substantial impact on motor vehicle inspections. The vehicle inspection system was confronted with a greater volume of reinspections necessitated in part by automobiles failing emissions tests. The Legislature responded by enacting L. 1975, c. 156, § 1 (N.J.S.A. 39:8-2). This law permitted the Director of DMV to license and supervise qualified private garages as Re-Inspection Centers (RICs) on a trial basis. In 1977, the private RICs were made permanent. *359 L. 1977, c. 270, § 1 (N.J.S.A. 39:8-24). The primary purpose of L. 1975, c. 156 was set forth in the sponsor's statement to the bill which was ultimately enacted into law:
Although many alternatives were considered, the prime motivation for the above provisions were health (annual emission testing) and safety (the National Highway Traffic Safety Administration states that vehicle defects directly cause 6% of the vehicular crashes and indirectly contribute to an additional 12%). Currently, New Jersey is the third safest state in the nation, having 2.8 fatalities for every 100 million miles traveled on its highways. It is believed the inspection system plays a part in this commendable safety statistic.
And, in an effort to maintain this record, this bill will permit modifications to the present system while retaining its primary purposes  health and safety.
[Statement to A-3010 (L. 1975, c. 156).]
In 1982, the DMV began a temporary biennial ("odd-even") inspection program to reduce the workload and waiting time at SICs. Additionally, on September 7, 1982, the DMV, in cooperation with local law enforcement authorities, began a program of random roadside inspections to measure the benefits of roadside inspections as a supplement to the existing public/private inspection program. These roadside inspections, conducted by MITs, are at issue in this appeal.
The DMV's recommendations were embodied in several bills and ultimately enacted into law in L. 1983, c. 236, §§ 2 and 3 (N.J.S.A. 39:8-1 and 2). Significantly, the law also expressly provided that the Director "shall conduct random roadside examinations of motor vehicles required to be inspected in this State to provide a continuous monitoring of motor vehicles." N.J.S.A. 39:8-2 (emphasis added). Under this law, each year at least 1% of the total number of motor vehicles registered in this State are required to be so inspected. Id.
Although the program for initial inspection of motor vehicles at PICs was instituted on a temporary basis, L. 1986, c. 22, §§ 1 and 2 (N.J.S.A. 39:8-1 and 2) made PICs permanent and, as indicated in the sponsor's statement:
[t]he roadside inspection program which permits continuous monitoring of the vehicles is continued. Roadside inspections would also serve to check vehicles that are inspected by private inspection centers.
[Statement to A-2218 (L. 1986, c. 22).]
*360 The Legislature has consistently demonstrated its conviction that there is a vital public health and safety concern that vehicles be maintained in a safe and proper operating condition at all times. To this end, the Legislature has given the Director of the DMV broad authority to take steps to ensure that the important state interests involved in safety and emissions inspections are met. It has never been the policy of this State to relieve an owner of all responsibility for the condition of his or her vehicle, or to relieve the vehicle from further inspection and oversight once the vehicle has passed an annual inspection. Rather, the legislative history evinces a mandate for continuous responsibility for and continuous oversight over the condition of motor vehicles registered in this State and operating on its roadways.
At the time defendant was stopped, there were 10 MITs operating in the State. Each team is comprised of four motor vehicle inspectors who work in conjunction with the local police departments. They work Monday through Friday, and to avoid interfering with the commuting traffic, their normal hours of operation are from 9:00 a.m. to 3:00 p.m.
In addition to checking the drivers' credentials and the vehicles' inspection stickers, the safety specialists check emissions, front-end suspension on vehicles with over 50,000 miles, steering, tires, brakes, parking brakes, lights/lenses, turn signals, glazing, horns and wipers, signs of vehicular tampering, catalytic converters, and fuel inlet restrictors.

III.
The State has a vital and compelling interest in maintaining highway safety by ensuring that only qualified drivers operate motor vehicles and that motor vehicles are in a safe condition. At the remand hearing, even defendant's attorney conceded that vehicle safety and the vehicle inspection program reflect legitimate public interests.
*361 We must weigh the role played by the MITs in furthering these State interests against the extent of the intrusion on motorists in this evaluation of the constitutionality of the vehicle inspection checkpoints. As we stated in our first opinion, the issue is whether the State's legitimate interest in highway and vehicular safety and the public health, as enforced by means of roadside vehicle safety checkpoints, is "of sufficient importance to warrant the intrusion upon the travelling public's federal and state constitutional rights to be free of warrantless seizures." Kadelak I, 258 N.J. Super. at 613, 610 A.2d 916.
The United States Supreme Court has emphasized that "the States have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation and hence, that licensing, registration, and vehicle inspection requirements are being observed." Delaware v. Prouse, 440 U.S. 648, 658, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660, 670 (1979). Court decisions from various jurisdictions have confirmed that the gravity of the State's interest in this regard justifies motor vehicle document and equipment inspection checkpoints. See United States v. Prichard, 645 F.2d 854, 855, 856 (10th Cir.) (systematic roadblock upheld as constitutional because the stated purpose  checking drivers' licenses and vehicle registrations  was "a legitimate one" under Prouse), cert. denied, 454 U.S. 832, 102 S.Ct. 130, 70 L.Ed.2d 110 (1981); United States v. Miller, 608 F.2d 1089, 1093, 1098 (5th Cir.1979) (finding systematic roadblocks for the purpose of checking drivers' licenses and registrations to be a "lawful state function" under Prouse), cert denied, 456 U.S. 964, 102 S.Ct. 2043, 72 L.Ed.2d 489 (1982); People v. Estrada, 68 Ill. App.3d 272, 24 Ill.Dec. 924, 929, 386 N.E.2d 128, 133 (1979) (The "strong State interest in preventing automobile accidents before they occur justifies at least systematic and undiscretionary brief stops of automobiles ... to check ... the operator's license of the driver or the safety equipment of the automobile itself."), cert. denied, 444 U.S. 968, 100 S.Ct. 459, 62 L.Ed.2d 382 (1979); see also Commonwealth v. Blouse, 531 Pa. 167, 611 A.2d 1177, 1179, 1180-81 (1992); State v. Patterson, 582 A.2d 1204, *362 1205-06 (Me. 1990), cert. denied, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991); State v. Wetzel, 456 N.W.2d 115, 118, 120 (N.D. 1990); accord United States v. Corral, 823 F.2d 1389, 1390, 1392-93 (10th Cir.1987), cert. denied, 486 U.S. 1054, 108 S.Ct. 2820, 100 L.Ed.2d 921 (1988); see generally Theresa Ludwig Kruk, Annotation, Validity of Routine Roadblocks by State and Local Police for Purpose of Discovery of Vehicular or Driving Violations, 37 A.L.R.4th 10 (1985).
These decisions indicate that the overwhelming weight of legal authority recognizes that the State has a compelling interest in maintaining highway safety by ensuring that only qualified drivers operate motor vehicles and that their vehicles are in a safe operating condition. This legal authority also recognizes the legitimacy of checkpoints to effectuate these goals. New Jersey's approach has been no different. Indeed, as this State's historical experience with motor vehicle inspections demonstrates, New Jersey's interests in this regard are particularly acute. As we noted in Kadelak I, the majority of states that have considered roadside safety blocks have found them constitutional. 258 N.J. Super. at 605, 607, 610 A.2d 916.
Inquiry into the reasonableness of police stops of motorists on public highways requires a balancing of the relevant interests involved. Brown v. Texas, 443 U.S. 47, 50-51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357, 361-62 (1979); see also Michigan State Police v. Sitz, 496 U.S. 444, 448-50, 110 S.Ct. 2481, 2484-85, 110 L.Ed.2d 412, 419-20 (1990); Kadelak I, supra, 258 N.J. Super. at 607, 610 A.2d 916. The State's compelling interest in highway and motor vehicle safety is evaluated against the effectiveness of roadside vehicle safety checkpoints in promoting that interest and the level of the checkpoints' intrusiveness on an individual's privacy. Brown v. Texas, supra, 443 U.S. at 50-51, 99 S.Ct. at 2640.
Analysis of the level-of-intrusion factor must be performed from the perspective that "automobiles are justifiably the subject of pervasive regulation by the State." New York v. Class, 475 U.S. 106, 113, 106 S.Ct. 960, 965, 89 L.Ed.2d 81, 90 (1986). Against this *363 backdrop of "extensive regulation of motor vehicles and traffic," Cady v. Dombrowski, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706, 714 (1973), the level of intrusion on motorists stopped briefly at MIT vehicle safety checkpoints is minimal. On the average, motorists are detained by the MIT for only two to three minutes. This brief time period remains constant regardless of whether the vehicle passes or fails inspection. Furthermore, as a matter of convenience for those motorists whose vehicles are due for inspection, if their vehicles pass the MIT inspection, they will be issued inspection cards indicating this fact. Thereafter, these motorists need only go to the exit area of a SIC and receive their inspection stickers. They do not have to wait in line for another inspection, which obviously saves them time. For those drivers whose vehicles are failed by the MIT, they have saved the time of going to a SIC or PIC only to be failed.
In United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Supreme Court upheld roadblocks designed to check for illegal aliens. In Sitz, supra, the Court determined that sobriety checkpoints are constitutional. Sitz, supra, 496 U.S. at 449-53, 455-56, 110 S.Ct. at 2485-86, 2488. In its discussion of the measure of intrusion stemming from roadblocks designed to check for illegal aliens compared to those designed to check for intoxicated drivers, the Sitz court found:
virtually no difference between the levels of intrusion on law-abiding motorists from the brief stops necessary to the effectuation of these two types of checkpoints, which to the average motorist would seem identical save for the nature of the questions the checkpoint officers might ask. The trial court and the Court of Appeals, thus, accurately gauged the "objective" intrusion, measured by the duration of the seizure and the intensity of the investigation, as minimal.
[Id. at 451-53, 110 S.Ct. at 2486 (citing Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074).]
In terms of the level of intrusiveness, there is also basically no difference between the stops which occurred in Martinez-Fuerte and Sitz and the vehicle safety stops which are the subject of this appeal. When compared to the typical motor vehicle stop (the "roving patrol" stop), the relative intrusion of any checkpoint stop  "`the stop itself, the questioning, and the visual inspection  *364 ... [is viewed] in a different light because the subjective intrusion  the generating of concern or even fright on the part of lawful travelers  is appreciably less in the case of a checkpoint stop.'" Prouse, 440 U.S. at 656, 99 S.Ct. at 1397 (quoting Martinez-Fuerte, 428 U.S. at 558, 96 S.Ct. at 3083). Moreover, the request that a driver alight from his or her vehicle in order to facilitate the roadside safety check "can only be described as de minimis...." Pennsylvania v. Mimms, 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331, 337 (1977); State v. Smith, 134 N.J. 599, 609-11, 637 A.2d 158 (1994) (adopting Mimms' analysis of the level of intrusion on driver).[5] At the remand hearing, the trial judge found that the intrusion on the traveling public in this case "is constitutionally acceptable. It is, in fact, minimal."
With regard to the third prong of the constitutional balancing process  the effectiveness of roadside safety checks  the United States Supreme Court, in noting the absence of empirical data to support the State's interest in conducting the arbitrary police stops of motor vehicles in Prouse, did not utilize the absence of such data to cast any doubt on the permissibility of roadside "inspection checkpoints, at which some vehicles may be subject to further detention for safety and regulatory inspection than are others." Prouse, 440 U.S. at 663, 99 S.Ct. at 1401 n. 26; see also Sitz, supra, 110 U.S. at 453-455, 110 S.Ct. at 2487. Nevertheless, because the Court in both Prouse and Sitz alluded to the importance of empirical data, data missing in Prouse but present in Sitz, the State at the remand hearing presented data derived from the operation of the MIT safety checkpoints. See State v. Moskal, 246 N.J. Super. 12, 16, 586 A.2d 845 (App.Div. 1991) (finding the sobriety checkpoint at issue constitutional in part because empirical data was produced to satisfy the requirement that it be carefully *365 targeted to a specified time and place). In fact, the number of violations and percentages of failures at MIT stops is overwhelming. These data compare very favorably with the statistics in major Supreme Court opinions upholding the use of checkpoints.
In Sitz, approximately 1.6 percent of the drivers passing through the checkpoint were arrested for alcohol impairment. Sitz, supra, 496 U.S. at 455, 110 S.Ct. at 2487. Significantly, the Court found the testimony of one expert witness significant who reported that "experience in other States demonstrated that, on the whole, sobriety checkpoints resulted in drunken driving arrests of around 1 percent of all motorists stopped." Id. at 455, 110 S.Ct. at 2487-88. Even though the ratio of drunken drivers detected to vehicles stopped was only 1.6 percent, the Court had no difficulty sustaining the constitutionality of the procedure.
In one of the consolidated cases in Martinez-Fuerte, the record indicated that, as a result of the vehicle checkpoint, illegal aliens were found in only 0.12 percent of the vehicles passing through. Sitz, supra, 496 U.S. at 455, 110 S.Ct. at 2487-88 (citing Martinez-Fuerte, supra, 428 U.S. at 553-55, 96 S.Ct. at 3081). Even though the ratio of illegal aliens detected to vehicles stopped was only about 0.5 percent (given that periodically two or more illegal aliens were found in a single vehicle), the Court also had no difficulty sustaining the constitutionality of the procedure. See Martinez-Fuerte, supra, 428 U.S. at 553-55, 562-64, 96 S.Ct. at 3081, 3085. We have found similar numbers generated by DWI roadblocks to be constitutionally sufficient. State v. Mazurek, 237 N.J. Super. 231, 237-39, 567 A.2d 277 (App.Div. 1989), certif. denied, 121 N.J. 623, 583 A.2d 320 (1990); cf. State v. Moskal, supra, 246 N.J. Super. at 16-18, 586 A.2d 845 (finding that although the number of DWI arrests at the sobriety checkpoint at issue fell below 1%, the success of such a checkpoint is also measured by other factors).
One of the appellant's arguments is that the State failed to present "empirical data demonstrating the efficacy of the constitutionally intrusive [MIT] roadblock." As previously indicated, the State did not, for the appropriate period, present any data to *366 determine the frequency of vehicles which passed inspection at either a SIC or a PIC but were found to have defects at a roadside inspection. However, at the remand hearing, the State did present significant data which clearly indicates the benefit MITs generate with respect to highway safety and cleaner air. The percentage of violations discovered by the MITs was overwhelming.
The MITs are instrumental in detecting violations relating to driving credentials and in uncovering violations or defects impacting substantially on the public safety and health. As one of the State's witnesses indicated, "the Mobile Inspection Teams are more effective in spotting equipment violations" than are the SICs. For example, in 1989, the MITs uncovered 2,332 vehicles with steering and suspension defects, 3,247 vehicles with brake defects, 6,391 vehicles with improperly-working lights, and 3,734 vehicles that were unlawfully polluting our air.
In 1990, the MITs uncovered 4,907 vehicles with faulty steering, suspension or tires, 6,196 vehicles with brake defects, 11,490 vehicles with improperly-working lights and 6,199 vehicles with faulty emissions. The MITs also caught motorists who had unlawfully tampered with their vehicles. There were 607[6] motorists who had disconnected or removed their catalytic converters and 172 motorists who tampered with their vehicle's fuel inlet restrictors.[7]
In 1991, the MITs uncovered 3,670 vehicles with faulty steering, suspension or tires, 3,662 vehicles with brake defects, 7,451 with improperly-working lights, and 5,128 vehicles with faulty emissions. The teams also caught 364 motorists who had tampered *367 with their catalytic converters and 178 motorists who had tampered with their fuel inlet restrictors.
The results of the MIT vehicle safety checkpoints far exceed the cited constitutionally accepted statistics. In fact, as just noted, the figures are staggering compared to the 1.6% of violators found in Sitz and 0.5% of violators found in Martinez-Fuerte. For instance, of the 41,493 vehicles stopped by MITs in 1989, 9% (3,734) had faulty emissions, thereby polluting the air. Of the 57,508 vehicles stopped by MITs in 1990, over 10% (6,199) had faulty emissions and 1.3% (779) were caught with tampered emission systems. Of the 33,849 vehicles stopped by MITs in 1991, over 15% (5,128) had faulty emissions and 1.5% (542) were caught with tampered emission systems.
On one occasion in Mt. Laurel, an MIT stopped a vehicle that was approved by a PIC that should not have been approved. After further investigation, the MIT discovered that this PIC was selling stickers and they subsequently found that "three garages in the area were involved in this scheme of selling stickers." They also found on numerous occasions illegal equipment, such as tinted windows and "motion neon," on vehicles approved by PICs who coincidentally sell such equipment.
Testimony at the remand hearing revealed that sixty-five to ninety percent of vehicles inspected at the MIT vehicle safety checkpoints failed inspection. As we discuss in more detail, infra, the fact that the percentage includes vehicles which failed because the driver did not have with him or her all the necessary credentials does not lessen the MITs' utility in the overall vehicle inspection program.
In our earlier opinion, we posited that "[i]n a state which requires annual inspection of vehicles for safety, the need for roadside inspections in addition is not entirely clear." Kadelak I, 258 N.J. Super. at 604, 610 A.2d 916. However, the empirical data for the years 1989, 1990 and 1991 clearly demonstrate that the need for roadside inspections is substantial. One of the State's witnesses testified that the reason there were so many of these *368 safety violations, despite the fact that the State requires all vehicles to be inspected at least once a year, is that some violations were intentional in that people alter their vehicles after inspection and then get stopped on the road, and some violations are due to normal wear and tear.
The record plainly establishes that the SICs and the yearly inspection process cannot keep pace with even the most routine vehicle wear and tear, nor with those motorists who insist on altering their vehicles after inspection. Experience has also demonstrated that, even with the operation of licensed PICs, which complement and augment the SICs, the process is still inadequate to properly address the aforementioned concerns. In one aspect, this is evidenced by the failure rate of vehicles. The best proof is that about 20 percent of the vehicles passing through PICs and about 35 percent of the vehicles passing through the SICs fail inspection, whereas 65 to 90 percent of the vehicles stopped at roadside safety checkpoints fail inspection. One of the reasons is that the PICs are not as meticulous or strict as they should be in their inspection process as established repeatedly by the "Independent Monitoring Unit" of the DMV. This unit audits the PICs, oversees the MITs, and conducts covert audits of both the PICs and SICs.
In 1989, 47 PICs were targeted for covert investigation and 33 wrongfully passed the defective vehicles. In 1990, 456 PICs were targeted and 193 wrongfully passed the defective cars. Of the 712 PICs investigated in 1991, 331 wrongfully passed the defective vehicles. Each of the defects planted in the covert vehicles would have been detected by the MITs, but none of those defects would have been, or could have been, detected by a police officer using conventional law enforcement procedures.
Thus, another salient feature of the MITs is that many of the inspection and motor vehicle violations uncovered by them are not readily detectable by police officers utilizing conventional law enforcement methods. As explained by the Pennsylvania Supreme Court in Commonwealth v. Blouse, supra, "[i]n this type of *369 case, the public interest cannot be met by less intrusive means, because traditional law enforcement procedures, such as stops based on a probable cause or reasonable suspicion standard, are incapable of detecting status offenses as opposed to observable offenses." 611 A.2d at 1179; Commonwealth v. McGeoghegan, 389 Mass. 137, 449 N.E.2d 349, 353 (1983) (roadblocks "may achieve a degree of law enforcement and highway safety that is not reasonably attainable by less intrusive means"); Fink v. State, 866 S.W.2d 333, 335 (Tex. Ct. App. 1993) (there is no practical alternative to a checkpoint for detecting licensing and liability insurance violations); cf. State v. Mazurek, supra, 237 N.J. Super. at 238, 567 A.2d 277 ("It is by no means surprising that the concentrated efforts involved in the investigation of possibly drunken drivers at reasonably selected checkpoints produce better results than customary police practices in which drunken drivers are detected fortuitously.") The remand court herein also made the determination that "a majority of the violations would not be found unless the car was stopped and subjected to the [MIT] inspection process."
We agree with that determination. For example, exhaust violations cannot usually be detected by a police officer during routine patrol unless smoke is present. Similarly, other violations that would not be readily observable by conventional police procedures include defective brakes (short of a total brake system failure), disconnected emergency brake cables, defective front ends, inoperable horns or windshield wipers, defective or faulty steering and suspension systems. Motor vehicle tampering is another area of great concern, because most cannot be detected by routine law enforcement procedures. Finally, the mere existence of the MITs serves as a substantial and salutary deterrence to those motorists who might otherwise allow their vehicles to deteriorate to the point of constituting a safety hazard and to deter those motorists who might otherwise alter their vehicles after conventional inspection.
*370 The failed vehicle data from the MIT checkpoints, regardless of whether based primarily upon observed-violation stops or systematic stops, clearly demonstrates that, but for the checkpoint being stationed at a designated location and at a designated time, a large number of unsafe vehicles and/or unfit operators would have driven past that location undetected. Of the 106 vehicles stopped on August 9, 1990 at defendant's stop, 63 failed inspection (59.43%). Moreover, a total of 72 motor vehicle violations were uncovered for which summonses were issued. Clearly, then, the MIT activity that day produced results which reasonably advanced the public interest in highway and vehicular safety by proactively preventing dangerous motor vehicle accidents. Far from demonstrating the MIT checkpoints' lack of efficacy, these statistics instead demonstrate the value of this program to the public safety.
Furthermore, defendant's contention that the MITs' uncovering of licensing and registration violations should not be part of the equation determining the efficacy of the checkpoints has been expressly rejected by the United States Supreme Court:
We agree that the States have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed. Automobile licenses are issued periodically to evidence that the drivers holding them are sufficiently familiar with the rules of the road and are physically qualified to operate a motor vehicle. The registration requirement and, more pointedly, the related annual inspection requirement... are designed to keep dangerous automobiles off the road. Unquestionably, these provisions, properly administered, are essential elements in a highway safety program.

[Delaware v. Prouse, 440 U.S. at 658, 99 S.Ct. at 1398-99 (emphasis added).][8]
*371 "In the common welfare, the State has an interest in regulating the use of its highways by requiring that vehicles traveling upon them be properly registered and that persons operating such vehicles be qualified to operate them safely." State v. Kabayama, 98 N.J. Super. 85, 88, 236 A.2d 164 (App.Div. 1967), aff'd o.b., 52 N.J. 507, 246 A.2d 714 (1968).
As the evidence disclosed, the MIT safety checkpoints substantially advance the State's interest in highway and vehicular safety and have proved to be an effective regulatory and law enforcement technique in enforcing traffic safety.
Defendant further alleges that the State must demonstrate the absence of less intrusive alternatives to the MIT checkpoint technique. As the Law Division determined, the MIT checkpoints' level of intrusion upon the motoring public is quite minimal. There is substantial credible evidence in the record to support the trial court's conclusion. State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964). Moreover, courts have recognized that less intrusive, yet similarly effective, methods of uncovering document violations and equipment violations which are not readily observable may not exist. More fundamentally, because the MIT checkpoint was developed by executive branch officials who are accountable to the public, they should not be second-guessed by the judiciary. Sitz, supra, 496 U.S. at 453-55, 110 S.Ct. at 2487 (citing Brown v. Texas, supra, 443 U.S. at 47, 99 S.Ct. at 2637). According to the Supreme Court in Sitz:
[F]or purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers.
[Ibid.]
See also Martinez-Fuerte, supra, 428 U.S. at 555-57, 96 S.Ct. at 3082 n. 12 (1976) ("The logic of ... less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search and seizure powers."); State v. Patterson, supra, 582 A.2d at 1205-06; State v. Sanchez, 856 S.W.2d 166, 173 *372 (Tex. Crim. App. 1993); State v. Moskal, supra, 246 N.J. Super. at 17, 586 A.2d 845.
The appropriate question is not whether a particular method is the best alternative or even whether it is a better alternative, but, rather, whether the method chosen is reasonably effective in advancing the State's interest. See Commonwealth v. Shields, 402 Mass. 162, 521 N.E.2d 987, 991-92 (1988) (noting that the majority of courts that have considered the issue have rejected the argument that the State must make a showing of "no less intrusive yet equally effective alternative").
"The fact that the protection of the public might, in the abstract, have been accomplished by `less intrusive' means does not, by itself, render [a] search unreasonable." Cady v. Dombrowski, supra, 413 U.S. at 447, 93 S.Ct. at 2531; see also State v. Stanton, 265 N.J. Super. 383, 386, 388, 627 A.2d 674 (App.Div. 1993) (upholding warrantless search pursuant to an exigency even though the exigency was police-created because the exigency was prompted by reasonable investigative law enforcement behavior).

IV.
At the remand hearing, the State also presented evidence of its interest in conducting MIT inspections to fulfill New Jersey's obligations to the federal government under the Clean Air Act. The remand judge's opinion recognizes this factor as enhancing the level of the State's legitimate interest in conducting MIT checkpoints when he stated:
The State's interest in this case is increased by the inclusion of the MIT program as part of an enhanced inspection program for purposes of the [State Implementation Plan] to reduce air pollution. This additional function of the MIT program clearly adds weight to the reasonableness of the discretionary decision on both legislative and administrative levels to commence and maintain the program. This weight must be added to the scale on the State's side as against the intrusiveness of the inspection process. Air pollution is a problem widely charged as having a significant impact on the public health. Motor vehicles are a major contributor to that problem. Inspection of emissions by all methods is perceived as making an important contribution to the effort to reduce pollutants. In that context, a roadside stop to check emissions is not unreasonable.
*373 There is substantial credible evidence in the record to support the trial court's conclusions. State v. Johnson, supra, 42 N.J. at 162, 199 A.2d 809.
The State agreed in its State Implementation Plan (SIP) promulgated pursuant to the Clean Air Act that it would conduct annual motor vehicle emissions inspections, covert and overt audits of inspection sites and mobile inspections of vehicles. See 42 U.S.C.A. § 7511a(c)(3)(C)(i) (requiring State program to contain computerized emission analyzers, including on-road testing devices). Thus, the State contends that New Jersey is obligated under its SIP to conduct roadside inspections in the enforcement of emission standards in addition to the yearly inspections.
Amicus ACLU disputes whether New Jersey's roadside emissions monitoring is actually federally required. Although New Jersey's commitment pursuant to its SIP is demonstrative of such a requirement, the ultimate issue is not whether emissions testing is mandated as a result of the State's SIP commitment to the federal government under the Clean Air Act or any other federal regulation because the air pollution problem in our densely-populated, heavily traveled State is of such magnitude that the State, even without federally based incentives, can legitimately mandate emissions testing at vehicle inspection checkpoints as part of a comprehensive vehicle safety plan in the interest of preserving the public health. See State v. Owens-Corning Fiberglas Corp., 100 N.J. Super. 366, 381, 242 A.2d 21 (App.Div. 1968), aff'd, 53 N.J. 248, 249, 250 A.2d 11 (1969) ("The menace to the public health by air pollution is so much a matter of common experience as properly to be a subject of judicial notice."). Whether federally required or State-driven, there is no doubt that the MIT emissions testing requirement enhances the State's interest in the MIT program.
The State has demonstrated that its interest in highway and vehicular safety is vital and compelling. The State has clearly shown that the MIT safety checkpoints rationally and efficaciously promote the safety interest while keeping the intrusion on individual *374 liberty to a minimum. Indeed, the State Legislature has also determined that roadside safety inspections advance the public interest in motor vehicle equipment safety.
Recently, the Pennsylvania Supreme Court appropriately determined that "the rationale behind upholding the constitutionality of drunk driving roadblocks applies equally to all systematic roadblocks, where the compelling interest of the state in protecting its citizens from harm, i.e., the mass carnage that results from unlicensed drivers and unsafe vehicles occupying the road, outweighs the privacy interests of the individual." Commonwealth v. Blouse, supra, 611 A.2d at 1179. That is also true in this case. Defendant and amicus ACLU argue that, even if the MIT vehicle safety checkpoints survive federal constitutional scrutiny, this court should apply a more rigorous standard of review under the New Jersey Constitution to invalidate this roadside inspection scheme. However, while it is settled that the State Constitution may provide greater protection than its federal constitutional counterpart, "it is equally settled that such enhanced protections should be extended only when justified by `[s]ound policy reasons.'" State v. Stever, 107 N.J. 543, 557, 527 A.2d 408 (1987) (quoting State v. Hunt, 91 N.J. 338, 345, 450 A.2d 952 (1982); other citations omitted), cert. denied, 484 U.S. 954, 108 S.Ct. 348, 98 L.Ed.2d 373 (1987). In the case before us, "the public policy of our State does not support an expansion of state law protections beyond those provided by the federal constitution." See ibid.
Adherence to the federal constitutional framework in this case is particularly appropriate given New Jersey's prior judicial treatment of motor vehicle stops and roadblocks. It is clear that, historically, the ceiling over the permissible range of police activity in this area has consistently been erected by the United States Supreme Court, not the New Jersey courts. Even this Court's seminal roadblock opinion, State v. Kirk, supra, while involving state constitutional principles, ultimately did not diverge from the United States Constitution in any respect in establishing requirements for a valid checkpoint. 202 N.J. Super. at 40-41, 55-56, 493 *375 A.2d 1271; see also State v. Mazurek, supra, 237 N.J. Super. at 238, 567 A.2d 277 (relying on federal caselaw in maintaining that the "success" of a roadblock cannot be measured solely in terms of the number of violators apprehended.) There is no reason for this court to change its interpretive course for purposes of this case.
At the conclusion of our original opinion, we voiced our recognition "that highway safety is certainly a matter of extreme importance to the public and may warrant this minimal intrusion [MIT checkpoints] upon the travelling public's right to be let alone." Kadelak I, 258 N.J. Super. at 613, 610 A.2d 916. Based upon the evidence presented on remand, we are now satisfied that the State's vital interest in highway safety and clean air warrants this minimal intrusion upon the travelling public, and we declare N.J.S.A. 39:8-2 constitutional and the MIT vehicle safety checkpoints properly established thereunder also to be constitutional.

V.
In addition to their general challenge to the constitutionality of MIT vehicle safety checkpoints, defendant and amicus ACLU still contest the legitimacy of the specific checkpoint at which defendant was apprehended, arguing that the checkpoint did not satisfy this Court's ruling in State v. Kirk, supra.
In our first opinion evaluating this particular roadblock, we stated:
We agree with the trial judge that the criteria suggested in State v. Kirk, to find a roadblock constitutional, have probably been met in this case.
[Kadelak I, 258 N.J. Super. at 605, 610 A.2d 916 (emphasis added).]
We have previously explicitly voiced approval that the MIT vehicle safety checkpoint at which defendant was stopped was designed and conducted in conformity with the foundational constitutional requirements of Kirk. Although we used the word "probably" earlier, after the remand, it is abundantly clear that the roadblock was constitutional.
*376 The opinion issued by the Law Division after the remand hearing contains findings with respect to the general nature and conditions of MIT vehicle safety checkpoints and conditions to which the August 9, 1990 checkpoint conformed, all of which further support our earlier conclusion that the MIT checkpoint at issue comported with Kirk. Specifically, the main concern in Kirk  control of the discretion of the police officer in the field  was satisfied in this case. The MIT checkpoint was established by the DMV in consultation with the Bordentown City Police Department and vehicle stops were conducted pursuant to predetermined selection criteria established by the chief of police. The motorists' convenience and welfare were accommodated by the scheduling of the checkpoint during non-rush hour time periods, and enforcement officers used ample physical area to allow for the safe stopping and inspection of vehicles. The duration of a motorist's encounter with DMV inspectors and police was minimal.
Defendant and amicus ACLU also challenge the checkpoint for lack of "advance publicity." This court has previously decided that the type of advance publicity contemplated by defendant (advance notice, media advertisements, etc.) is not a prerequisite to the validity of a roadblock. See State v. DeCamera, 237 N.J. Super. 380, 383, 568 A.2d 86 (App.Div. 1989) (finding it "wholly unnecessary and perhaps counter-productive to judicially mandate" advance newspaper notice of police roadblocks). In State v. Moskal, supra, 246 N.J. Super. at 19, 586 A.2d 845, we stated that "[a]ll that is necessary within the State v. Kirk framework are the proper on-the-scene warnings (a sign stating that the motorist is about to be stopped and the nature of the stop, flashing lights, police vehicles and uniformed officers) to comply fully with State and Federal constitutional requirements." Such warnings were utilized in this case.
Amicus ACLU also claims that the lack of data justifying the selection of the site of the August 9, 1990 checkpoint renders the checkpoint constitutionally deficient. However, we have already ruled in this case that site selection for vehicle safety checkpoints *377 is of a completely different nature than site selection for DWI roadblocks. Kadelak I, 258 N.J. Super. at 605, 610 A.2d 916.
Finally, amicus ACLU alleges that there was no specified neutral procedure established for MIT checkpoint personnel. The evidence shows otherwise. One of the factors which Kirk lists as enhancing the likelihood of judicial approval of a roadblock is that the roadblock employ "officially specified neutral and courteous procedures for the intercepting officers to follow when stopping drivers." State v. Kirk, supra, 202 N.J. Super. at 41, 493 A.2d 1271. The MIT checkpoint, in fact, had such a procedure which called for the stopping of every fifth vehicle and vehicles with observable violations. Vehicles found to have violations were routinely referred by MIT inspectors to a police officer. The police herein were acting pursuant to a fixed plan instituted by supervisory personnel. This procedure satisfied constitutional requirements.
We affirm the order of the Law Division dated November 19, 1993, and vacate the stay previously imposed upon the execution of defendant's sentence.
NOTES
[1] Defendant was also charged with driving with an open container of alcohol, N.J.S.A. 39:4-51a, and failure to present a registration and insurance card, N.J.S.A. 39:3-29. The municipal court judge merged the open container violation with the DWI conviction. The judge apparently dismissed the charge of failure to present a registration and insurance card.
[2] At oral argument, the State informed us that this type of information was not available for the time period involved herein but that such records are available beginning with the year 1994.
[3] The Motor Vehicle Inspection Commission was established by Executive Order No. 50 of Governor Byrne (February 15, 1977) and was comprised of legislators, motor vehicle officials and citizen members. 1978 MVIC Report at 1.
[4] The DMV inspectors associated with the MITs in the 1970's were vested with police authority and were thus empowered to stop vehicles with obvious defects. The inspectors in current MITs do not have such police authority and, therefore, work with local police officers who are able to "pull over" vehicles for inspection.
[5] The incidence of drivers who actually exit their vehicles at MIT vehicles safety checkpoints is rare. The remand record shows that only three to five percent of the vehicles stopped had brake problems of a severity which required the operator to exit the car so that an MIT inspector could conduct a closer analysis.
[6] The testimony of Thomas Wright indicated 670 tamperers of their catalytic converters whereas the chart S-2 shows 607.
[7] The tampering related to the "fuel inlet restrictor" consists of widening the opening to the vehicle's gas tank to allow leaded fuel to be introduced into a car that is designed to accept only unleaded fuel. This totally disrupts or "poison[s] the catalytic converter."
[8] Justice Rehnquist's dissent in Prouse offers a more vivid perspective on the importance of enforcing licensing and registration requirements:

The State's primary interest, however, is in traffic safety, not in apprehending unlicensed motorists.... The whole point of enforcing motor vehicle safety regulations is to remove from the road the unlicensed driver before he demonstrates why he is unlicensed. The Court would apparently prefer that the State check licenses and vehicle registrations as the wreckage is being towed away.
[440 U.S. at 666, 99 S.Ct. at 1402 (Rehnquist, J., dissenting).]