237 N.J. Super. 231 (1989)
567 A.2d 277
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOHN MAZUREK, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 11, 1989.
Decided December 8, 1989.
*233 Before Judges J.H. COLEMAN, BRODY and SKILLMAN.
Kevin H. Marino argued the cause for appellant (Robinson, Wayne & La Sala, attorneys; Kevin H. Marino on the letter brief).
James W. Kennedy, Assistant Prosecutor, argued the cause for respondent (John Kaye, Prosecutor of Monmouth County, attorney; Patricia B. Quelch, Assistant Prosecutor, of counsel and on the letter brief).
The opinion of the court was delivered by COLEMAN, J.H., P.J.A.D.
The pivotal issue raised in this appeal is whether the empirical data accumulated from a particular sobriety checkpoint justifies the site selection for reasons related to public safety and to reasonably efficacious or productive law enforcement goals. We hold that the data does justify the site selection and that customary methods of detecting drunken drivers would not have been more efficacious.
On June 8, 1988, defendant was arrested at a sobriety checkpoint in Matawan, New Jersey, for driving while intoxicated (DWI), contrary to N.J.S.A. 39:4-50(a). After the denial of a motion to suppress evidence based on the alleged illegality of the roadblock, defendant pleaded guilty to the charge and reserved the right to raise the issue on appeal. See R. 3:5-7(d). He was fined $250 and his driver's license was suspended for six months. On this appeal, he contends that the "Matawan sobriety checkpoint was not carefully targeted to a designated area based on data justifying the site selection for reasons of public safety and reasonably efficacious or productive law enforcement goals."
Although the issue has not been raised, we must first decide whether this appeal is properly before us. The notice of appeal states this is an appeal from a final judgment and order of the *234 Law Division entered on January 26, 1989 denying the suppression motion. But that order was interlocutory since the drunken driving charge was still outstanding until defendant entered his guilty plea in the municipal court on February 2, 1989. In his brief, defendant states this appeal is authorized by R. 3:5-7(a).
That rule only preserved for appeal the denial of the suppression motion following the guilty plea. R. 2:2-3(b) permits an interlocutory appeal to this court when leave is granted from a final judgment of a municipal court in the interest of justice. R. 2:5-6(a), however, requires an application for leave to appeal from such a final judgment to be made within 15 days after entry of judgment. A 15-day extension is permitted by R. 2:4-4(b)(1). Because defendant only challenges the denial of his suppression motion by the Law Division, in the interest of justice and judicial economy, we have elected to treat the notice of appeal as a motion for leave to appeal from the final judgment entered in the Matawan Municipal Court. Since the notice of appeal was filed 20 days after the entry of judgment, we hereby extend the time for filing nunc pro tunc to February 22, 1989. Similarly, we sua sponte grant leave to appeal nunc pro tunc. We note that the problem may have been ameliorated in part with the recent amendment to R. 7:4-2(f) which permits a drunken driving suppression motion to be heard in the municipal court. Once the motion and the charge are disposed of in the municipal court, any appeal then goes to the Law Division. See R. 3:23; R. 3:24; R. 7:4-2(f). Under the present rules, there is no appeal of right to the Appellate Division from actions triable in municipal courts.
The facts germane to our decision are not disputed. In January 1985, the Monmouth County DWI Strike Force (Strike Force) notified the Matawan Police Department that a Strike Force sobriety checkpoint would be established in the Borough of Matawan on January 19, 1985. Anthony L. Paduano, Chief of the Neptune Police Department, was the coordinator of the *235 Strike Force. Matawan Police Captain Irving Nusbaum, in consultation with his superiors, designated the intersection of Broad Street and Highway 34 as the Matawan checkpoint site. Captain Nusbaum understood that the purpose of the site was to apprehend drunken drivers. The first sobriety roadblock was established on January 19, 1985 at Broad Street and Highway 34. Nine sobriety roadblocks were operated at this site between January 19, 1985 and June 18, 1988 for approximately four hours each time. Not every vehicle was stopped, but they were stopped in accordance with a predetermined pattern at a given time. Defendant was stopped at this roadblock on June 18, 1988 at approximately 1:00 a.m. Based on the consequent discovery of his intoxicated condition, he was arrested for driving while intoxicated. A breathalyzer test was administered which revealed a blood alcohol level of .12%.
The Law Division judge denied the motion to suppress. He found that the roadblock site was justifiably based on "reasons of public safety and reasonably efficacious or productive of law enforcement goals." The judge viewed law enforcement goals not only to include apprehending drunk drivers, "but also to [ensure] that the public is aware that these roadblocks are going to be out there and hopefully ... act as a deterrent."
On this appeal, defendant argues that the sobriety checkpoint selected is unconstitutional because it was not justified by empirical data showing that the public's safety warrants the checkpoint. The State counters by urging that the data supported the need to heighten public awareness and increase public safety.
Stopping an automobile and detaining its occupants constitute a seizure within the meaning of the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution. Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660, 667 (1979); State v. Barcia, 235 N.J. Super. 311, 316 (App.Div. 1989); State v. Kirk, 202 N.J. Super. 28, 38 (App.Div. 1985). Although the *236 police need not obtain a warrant to set up a roadblock, a defendant is free to challenge the validity of the decision as to when and where it should be operated. State v. Kirk, 202 N.J. Super. at 44. See generally Simmons v. Commonwealth, 238 Va. 200, 380 S.E.2d 656 (1989). Because the roadblock is a warrantless seizure, and as such is presumed to be invalid, the State has the burden of proving its overall reasonableness and validity. State v. Valencia, 93 N.J. 126, 133 (1983); State v. Kirk, 202 N.J. Super. at 55. To be constitutionally valid, the roadblock must be conducted in a manner "calculated in advance to provide the least possible intrusion into the public's freedom and sense of security." State ex rel. Ekstrom v. Justice Court, 136 Ariz. 1, 10, 663 P.2d 992, 1001 (1983) (Feldman, J., concurring); State v. Kirk, 202 N.J. Super. at 53.
In Kirk, we established the following general guidelines for determining the validity of a roadblock:
If the road block was established by a command or supervisory authority and was carefully targeted to a designated area at a specified time and place based on data justifying the site selection for reasons of public safety and reasonably efficacious or productive law enforcement goals, the road block will likely pass constitutional muster. Other factors which enhanced judicial approval were (1) adequate warnings to avoid frightening the traveling public, (2) advance general publicity designed to deter drunken drivers from getting in cars in the first place, and (3) officially specified neutral and courteous procedures for the intercepting officers to follow when stopping drivers. [State v. Kirk, 202 N.J. Super. at 40-41].
Based on these guidelines, defendant argues that the checkpoint location cannot be justified based on accumulated empirical data.
It cannot be denied that by 1988 New Jersey had a strong governmental interest in deterring and punishing intoxicated drivers. The problem of drunken driving has become one of enormous magnitude: day after day, drunken drivers maim and kill. "The carnage caused by drunk drivers is well documented and needs no detailed recitation here." South Dakota v. Neville, 459 U.S. 553, 558, 103 S.Ct. 916, 920, 74 L.Ed.2d 748, 755 (1983). Nationally, one of every 50 drivers on the road has a blood-alcohol content of .10% or higher (which in New Jersey *237 creates a presumption of intoxication). Federal Legislation to Combat Drunk Driving Including National Driver Register Hearings on S. 671, S. 2158 Before the Subcomm. on Surface Transportation of the Senate Comm. on Commerce, Science and Transportation, 97th Cong., 2d Sess. 112 (1982). Furthermore, on Friday and Saturday nights (when the roadblocks in the present case were conducted) one out of every 10 drivers was believed to be intoxicated. Ibid.
The Borough of Matawan consists of approximately two and a half square miles. Within a one-mile radius of the checkpoint, 17 licensed liquor establishments exist and within a four-mile radius, 106 such establishments exist.
Between 1985 and June 18, 1988, the data reveals that on the nine occasions the roadblock was in operation, 2,570 motor vehicles were stopped at this checkpoint. Ten of those persons were arrested for DWI. During the same period, 2,036 accidents occurred within a one mile-radius of the checkpoint and eight of those accidents involved the use of alcohol. Consequently, approximately one-half of a percent of the operators of vehicles stopped at the checkpoint (.49%) and of those involved in accidents within a mile radius of the checkpoint (.42%) were charged with DWI. The 2,036 accidents caused two fatalities and injuries to 392 persons.
In addition, the data collected at the checkpoint on the eight occasions prior to June 17, 1988, illustrates that 2,219 vehicles were stopped and that six DWI arrests were made. This means that approximately .27% of the vehicles stopped were operated by a drunken driver. On June 17-18, 1988, however, 11.4% of the drivers stopped were intoxicated. Beyond the 10 DWI arrests made at the checkpoint from its inception through June 18, 1988, the Matawan police made 49 other DWI arrests. Hence, approximately 20 percent of all the DWI arrests made between 1985 and June 18, 1988 were made at the checkpoint. Significantly, the checkpoint operated only approximately four hours each time for a total of 36 hours. On an hourly basis, *238 one DWI arrest occurred for each 2.75 hours of operation. In contrast, during the same three and one-half year period, customary police procedures, which we assume were in operation 24 hours a day, produced one DWI arrest for each 624 hour interval.
To be sure, we recognize that some variables have not been considered in our statistical analysis. But even making allowances for certain unknown factors, the conclusion seems inescapable: that the checkpoint was a properly targeted location that was efficacious. We are persuaded, as was the Supreme Court in United States v. Martinez-Fuerte, 428 U.S. 543, 553-562, 96 S.Ct. 3074, 3081-3085, 49 L.Ed.2d 1116, 1125-1131 (1976), that "success" of a checkpoint cannot be measured solely in terms of the number of violators apprehended. In the present case, the approximately .49% of the drivers stopped who were intoxicated at the checkpoint between 1985 and June 18, 1988, and even the .27% stopped prior to June 17, 1988, was substantially higher than the.12% of the drivers stopped at a checkpoint who were transporting illegal aliens in Martinez-Fuerte, 428 U.S. at 554, 96 S.Ct. at 3081, 49 L.Ed.2d at 1126. We conclude, as did the Court in Martinez-Fuerte, that the "need for this enforcement technique is demonstrated by the records...." Id. at 562, 96 S.Ct. at 3085, 49 L.Ed.2d at 1131.
It is by no means surprising that the concentrated efforts involved in the investigation of possibly drunken drivers at reasonably selected checkpoints produce better results than customary police practices in which drunken drivers are detected fortuitously. The data presented in the present case would seem to support the conclusion reached in Commonwealth v. McGeoghegan, 389 Mass. 137, 143-144, 449 N.E.2d 349, 353 (1983), that roadblocks "may achieve a degree of law enforcement and highway safety that is not reasonably attainable by less intrusive means." See also Commonwealth v. Shields, 402 Mass. 162, 521 N.E.2d 987 (1988) (holding that the State need not establish that less intrusive measures are ineffective *239 before resorting to roadblocks). A similar view was expressed in State v. Superior Court, 143 Ariz. 45, 691 P.2d 1073 (1984) and in State ex rel. Ekstrom v. Justice Court, 136 Ariz. 1, 663 P.2d 992 (1983). See also 4 LaFave, Search & Seizure, § 10.8(d) at 69, 72 (2d ed. 1987).
We are aware that Chief Paduano testified that the checkpoint was "pitifully unproductive" and that his view is shared by some other police officials nationally. See Sitz v. Department of State Police, 170 Mich. App. 433, 440-443, 429 N.W.2d 180, 183-184 (1988), cert. granted sub nom. Michigan Dept. of State Police v. Sitz, ___ U.S. ___, 110 S.Ct. 46, 107 L.Ed.2d 15 (1989) (holding that checkpoints are not an effective means for apprehending intoxicated drivers). Notwithstanding Chief Paduano's opinion, the data convinces us that the balancing test required by Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), was satisfied in that the checkpoint advanced the public interest to a much greater degree than could be achieved through traditional less intrusive police procedures. Hence, we conclude that a rational basis existed for the site selection and that it was reasonably efficacious. See State v. Kirk, 202 N.J. Super. at 48, 56. See also State v. Egan, 213 N.J. Super. 133, 136 (App.Div. 1986).
We therefore hold that the warrantless stopping of defendant's vehicle that led to the discovery of his intoxicated condition was reasonable under the Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution. Because the State sustained the burden of proving the validity of the seizure, the order dated January 26, 1989 denying the motion to suppress is affirmed. Defendant having entered his guilty plea pursuant to R. 3:5-7(d), the judgment of conviction is affirmed.
Affirmed.