246 N.J. Super. 12 (1991)
586 A.2d 845
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
CHESTER MOSKAL, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 8, 1991.
Decided February 11, 1991.
*13 Before Judges MICHELS and D'ANNUNZIO.
Michael R. Speck argued the cause for appellant (Francis X. Moore, attorney, Michael R. Speck, of counsel and on the brief).
John J. Scaliti, Assistant Bergen County Prosecutor, argued the cause for respondent (John J. Fahy, Bergen County Prosecutor, *14 attorney, Susan W. Sciacca, of counsel and on the letter brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Defendant Chester Moskal challenges an order of the Law Division that denied his motion to suppress evidence seized without a warrant during a State Police sobriety checkpoint or roadblock (sobriety checkpoint).
Briefly, by way of background, on February 20, 1987, defendant was arrested at a New Jersey State Police sobriety checkpoint on Route 17 in East Rutherford, New Jersey and charged with driving while under the influence of intoxicating liquor in violation of N.J.S.A. 39:4-50 and of refusing to submit to a breathalyzer test in violation of N.J.S.A. 39:4-50.2. Defendant moved in the Law Division to suppress the evidence of his intoxication seized without a warrant. Judge Madden in the Law Division denied that motion. Thereafter, defendant was found guilty in the Municipal Court of the Township of East Rutherford of driving while under the influence of intoxicating liquor and of refusing to submit to a breathalyzer test. The Municipal Court judge suspended defendant's driving privileges for two years, fined him $500, surcharged him $100 and ordered him to perform 30 days of community service for driving while under the influence of intoxicating liquor. Additionally, the Municipal Court judge suspended defendant's driving privileges for six months (which suspension was to be served consecutively to the two year suspension), fined him $250 and ordered him to attend 48 hours in an Intoxicated Driver's Resource Center for refusing to take the breathalyzer test. Defendant appealed to the Law Division, where he renewed his suppression motion. Judge Sciuto in the Law Division declined to rehear the motion to suppress and affirmed defendant's convictions. We granted defendant leave to appeal nunc pro tunc.
*15 Defendant now seeks a reversal of the order denying his motion to suppress on the following grounds set forth in his brief:
I. THE STOP OF DEFENDANT'S AUTOMOBILE WAS AN IMPROPER SEIZURE IN VIOLATION OF THE DEFENDANT'S FOURTH AMENDMENT RIGHTS.
II. THE ARREST OF THE DEFENDANT WAS UNLAWFUL AS THE TROOPER HAD NO RIGHT TO STOP THE DEFENDANT'S VEHICLE AND APPROACH IT.
III. THE ARREST OF THE DEFENDANT WAS UNLAWFUL AS THERE WAS NO PROBABLE CAUSE.
IV. ANY EVIDENCE OBTAINED AS A RESULT OF THE UNLAWFUL DETENTION OF THE DEFENDANT MUST BE EXCLUDED AS THE FRUITS OF THE VIOLATION OF THE DEFENDANT'S FOURTH AMENDMENT RIGHTS.
We have carefully considered these contentions and all the arguments advanced by defendant in support of them and find that they are clearly without merit. R. 2:11-3(e)(2). However, further comment is appropriate with respect to some of these contentions.

I.
We are satisfied that, contrary to defendant's claim, the stop of his vehicle was neither unconstitutional nor unreasonable and the State Police sobriety checkpoint did not violate the guidelines set forth in State v. Kirk, 202 N.J. Super. 28, 493 A.2d 1271 (App.Div. 1985). In State v. Kirk, we set forth the general guidelines for determining whether a sobriety checkpoint was constitutional, in part, stating:
If the road block was established by a command or supervisory authority and was carefully targeted to a designated area at a specified time and place based on data justifying the site selection for reasons of public safety and reasonably efficacious or productive law enforcement goals, the road block will likely pass constitutional muster. Other factors which enhanced judicial approval were (1) adequate warnings to avoid frightening the traveling public, (2) advance general publicity designed to deter drunken drivers from getting in cars in the first place, and (3) officially specified neutral and courteous procedures for the intercepting officers to follow when stopping drivers. [Id. at 40-41, 493 A.2d 1271].
*16 See State v. DeCamera, 237 N.J. Super. 380, 382, 568 A.2d 86 (App.Div. 1989); State v. Mazurek, 237 N.J. Super. 231, 236, 567 A.2d 277 (App.Div. 1989), certif. denied 121 N.J. 623, 583 A.2d 320 (1990).
Based on these guidelines, it is clear that the sobriety checkpoint challenged on this appeal passed constitutional muster. First, sufficient empirical data was produced about the sobriety checkpoint site to satisfy the requirement that it "was carefully targeted to a designated area at a specified time and place based on data justifying the site selection for reasons of public safety and reasonably efficacious or productive law enforcement goals...." State v. Kirk, supra, 202 N.J. Super. at 40-41, 493 A.2d 1271. Second, with respect to the specified time element, State Police Sergeant Budzinski, a traffic analyst responsible for collecting data in the northern counties of New Jersey for traffic enforcement programs, testified that weekend nights are the prime time when most drunk driving and alcohol related fatalities occur.
It need not be shown that the exact spot where a sobriety checkpoint is set up be a cause of accidents or fatalities, just that the general location provides public safety and is reasonably efficacious. See State v. Mazurek, supra, 237 N.J. Super. at 237-38, 567 A.2d 277; State v. Kirk, supra, 202 N.J. Super. at 40-41, 493 A.2d 1271. Here, Sergeant Budzinski testified that within the two miles immediately south of the sobriety checkpoint site on Route 17 there were 205 accidents, approximately 20% being alcohol related, and 80 injuries in 1983; there were 216 accidents, approximately 10% being alcohol related, and 2 deaths in 1984; and there were 263 accidents, approximately 10% being alcohol related, 103 injuries and 1 death in 1985.
From July 1986 to April 1987, 47 DWI arrests were made at or near the presently contested sobriety checkpoint site as a result of both mobile patrols and sobriety checkpoints. From July 1986 to February 1987, four sobriety checkpoints (excluding *17 the presently contested one) were held at the site each lasting approximately two to three hours and resulting in two arrests for driving while intoxicated. On the night of defendant's arrest a total number of 495 cars were stopped during the two hour sobriety checkpoint resulting in one driving while intoxicated arrest and one refusal arrest. Although the number of arrests resulting from the sobriety checkpoint falls below 1%, the "`success' of a checkpoint cannot be measured solely in terms of the number of violators apprehended." State v. Mazurek, supra, 237 N.J. Super. at 238, 567 A.2d 277 (sobriety checkpoint upheld as efficacious where .49% of drivers stopped were arrested for DWI between 1985 and June 18, 1988 and prior to June 17, 1988 only .27%). See Michigan Department of State Police v. Sitz, 496 U.S. ___, 110 S.Ct. 2481, 110 L.Ed.2d 412, 423 (1990) (1.5% arrested for DWI at constitutional checkpoint and 1% national average); United States v. Martinez-Fuerte, 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116, 1126 (1976) (.12% arrest rate at constitutional checkpoint for illegal aliens).
The sobriety checkpoint advanced the public interest to a greater degree than could have been achieved through traditionally less intrusive police means. First, excluding the presently contested sobriety checkpoint, out of the 47 DWI arrests over an eight month period at or near the sobriety checkpoint site, two arrests resulted from approximately eight hours of sobriety checkpoint operations. Therefore, every four hours one person would be arrested for DWI while under traditional methods it would take approximately seven days of manpower for one arrest. Second, "for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, ...." Michigan Department of State Police v. Sitz, supra, 496 U.S. at ___, 110 S.Ct. at 2487, 110 L.Ed.2d at 422.
As to the number of liquor establishments and public awareness, Sergeant Budzinski testified that:

*18 When I set up the Route 17 site, when I was out to the site, I observed that this would be an ideal location for public awareness, people coming from New York. It's a highly, heavily traveled area, especially northbound to points wherever north, to Route 80, up to Hackensack, Mahwah, New York State for that matter. This would be the ideal location to set up that checkpoint for the safety of the public and to make public awareness.
Of course topography is very important. Traffic control is extremely important. We have at this location, this is Milepost 5.1, 5.2, right at the intersection of, I think it is, Union Avenue, sometimes referred to as Union Boulevard, three lanes northbound, wide shoulder with sufficient distance for our various equipment and signs and traffic direction. It gives the motoring public sufficient area, sufficient time and sufficient area to be aware that the checkpoint is ahead so they can make the proper adjustments to their automobile[s].
[W]e have a lot of establishments in the communities surrounding this site, taverns, restaurants, bars, night spots. We have the Sports Complex, which has something going on just about every evening. We also have New York City and a lot of Hudson County, further east we have a lot of people, a lot of motorists traverse that particular area during peak hours where fatals could happen and have happened in the past.
Taking the DWI arrest rate, the past accident rate, public safety and public awareness all into account, it is reasonable to conclude that a rational basis existed for selecting the sobriety checkpoint site and the sobriety checkpoint site was reasonably efficacious.
Furthermore, the requisite "participation of command or supervisory authority" in selecting the time and place of the sobriety checkpoint was met. This is not a case of "[s]imply sending out officers to set up road blocks when and where they [feel] like it, without any command participation as to site, time and duration, ...." State v. Kirk, supra, 202 N.J. Super. at 41, 493 A.2d 1271. Nor is the case similar to State v. Egan, 213 N.J. Super. 133, 516 A.2d 1115 (App.Div. 1986), where a roadblock was held unconstitutional for not meeting the criteria under State v. Kirk. In Egan, a police sergeant, fourth in the chain of command and just above patrolman, was the Watch Commander and ranking supervising officer on duty. He alone decided to set up the roadblock. The roadblock was staffed by the sergeant and two patrolman who stopped every car that came upon it. No detailed explanation was given for setting up the roadblock. State v. Egan, supra, 213 N.J. Super. at 134-35, *19 516 A.2d 1115. Also the police department "had no written procedures governing the operation of drunken driving roadblocks and no formal report was prepared detailing the results of that night's operation." Id. at 135, 516 A.2d 1115. Further, the sole police witness could not say how many cars had been stopped that night. Id.
Here, Sergeant Budzinski recommended establishing a sobriety checkpoint at the site. However, the final approval came from the troop commander as to where, when and how long the sobriety checkpoint would last and the State Police Division Headquarters authorized the manpower for it. Further, the State Police operated the sobriety checkpoint in compliance with written operations instructions which were reviewed at roll call, supplied to the checkpoint's commander, and kept on site in the checkpoint van. Moreover, the troop commander received a written report and log of vehicles passing through the sobriety checkpoint. These steps satisfy the "participation of command or supervisory authority in selecting the time and place of the roadblock" requirement under State v. Kirk, supra, 202 N.J. Super. at 40, 493 A.2d 1271.
All the necessary advance publicity and warnings of the sobriety checkpoint site were given. No advance announcement of the specific time, location and date was released to the press; however, sobriety checkpoints had received wide publicity in various mediums at that time. Also two reflectorized signs stating "Stop. Sobriety Checkpoint" were placed in visible spots, along with flares, reflectorized cones, reflectorized barrels, uniformed troopers, and flashing lights prior to reaching the sobriety checkpoint. The sobriety checkpoint was set up to provide ample notice and warning to the oncoming motorists that a sobriety checkpoint was ahead. All that is necessary within the State v. Kirk framework are the proper on-the-scene warnings (a sign stating that the motorist is about to be stopped and the nature of the stop, flashing lights, police vehicles and uniformed officers) to comply fully with State and Federal constitutional requirements. State v. DeCamera, supra, *20 237 N.J. Super. at 383-84, 568 A.2d 86. As we explained in State v. DeCamera, supra, 237 N.J. Super. at 383, 568 A.2d 86:
We are cognizant of the fact that some positive results might flow from advance newspaper notice of police roadblocks. It is possible that if the public was aware that there was to be a sobriety checkpoint on a particular day, but was not aware of its location, intoxicated persons might be less likely to attempt to drive. This heightened effectiveness, however, does not rise to the level of a constitutional imperative. The positive effects of publicizing both the time and the place of roadblocks would be outweighed by the detention and deterrent value of roadblocks established under the current guidelines.

II.
Additionally, we are satisfied that defendant was not stopped as a result of the arresting State Trooper's unbridled discretion. Pursuant to the checkpoint operations procedure, every motorist was to be stopped with a State Trooper introducing himself, explaining the purpose of the stop and handing the motorist a pamphlet. Every twentieth car was directed to the right shoulder for a credentials check based upon the count of the tally officer who recorded the license plate numbers. In addition to pulling over the pre-determined numbered vehicles, the State Troopers were instructed to look for drivers who might be intoxicated. If a State Trooper suspected a driver to be under the influence, the trooper would ask the driver to step from his car and then escort him to a field interrogatory area where an interview and certain psychophysical tests would be conducted. As defendant's vehicle pulled into position, the arresting State Trooper saw defendant's face very close to the windshield. His face was extremely flush and his eyes were drooping and red. In accordance with normal procedure for the issuance of pamphlets, the State Trooper approached defendant's vehicle as he signalled for defendant to stop. When the door was opened, the State Trooper detected a strong odor of alcohol on defendant's breath and defendant admitted to drinking. At that point, defendant was directed to step from his car and was escorted to the side of the road. The procedure employed here was clearly constitutional and the arrest of defendant that *21 followed legal. As we stated in State v. Barcia, 235 N.J. Super. 311, 316, 562 A.2d 246 (App.Div. 1989):
[A] motor vehicle may be stopped without a reasonable suspicion, if a roadblock is established by supervisory police officials and the time, location and operation is reasonable and does not bear "arbitrarily or oppressively on motorists as a class." United States v. Martinez-Fuerte, supra, 428 U.S. at 559, 96 S.Ct. at 3083; accord State v. Kirk, supra, 202 N.J. Super. at 40-41 [493 A.2d 1271].
See also State v. Kirk, supra, 202 N.J. Super. at 56, 493 A.2d 1271.

III.
Finally, we are satisfied that the State Trooper had probable cause to arrest defendant on the ground that he was operating a motor vehicle while under the influence of intoxicating liquor. Probable cause for a search or arrest exists where a police officer has a well-founded suspicion or belief of guilt. State v. Wanczyk, 201 N.J. Super. 258, 266, 493 A.2d 6 (App. Div. 1985). That suspicion or belief may constitute something less than the proof needed to convict and something more than a raw, unsupported suspicion. Id. In other words, "[p]robable cause to arrest or search an individual generally is defined as a well grounded suspicion or belief on the part of the searching or arresting officer that a crime has been or is being committed." State v. Guerrero, 232 N.J. Super. 507, 511, 557 A.2d 713 (App.Div. 1989). See State in the Interest of A.R., 216 N.J. Super. 280, 285, 523 A.2d 678 (App.Div. 1987).
"[T]he yardstick for making [an] arrest for driving while under the influence of intoxicating liquor ... is whether the arresting officer `had reasonable grounds to believe' that the driver was operating a motor vehicle in violation [of N.J.S.A. 39:4-50]." Strelecki v. Coan, 97 N.J. Super. 279, 284, 235 A.2d 37 (App.Div. 1967). Here, sufficient credible evidence exists in the record as a whole to support the trial court's finding that the arresting State Trooper had probable cause to believe defendant was operating a motor vehicle while under the influence of intoxicating liquor. We discern no sound reason or *22 justification for disturbing such finding and conclusion. State v. Johnson, 42 N.J. 146, 161-62, 199 A.2d 809 (1964); State v. Grant, 196 N.J. Super. 470, 475, 483 A.2d 411 (App.Div. 1984).
Accordingly, the order of the Law Division denying defendant's motion to suppress is affirmed substantially for the reasons expressed by Judge Madden in his oral opinion of June 24, 1987.