725 A.2d 1129 (1999)
319 N.J. Super. 426
STATE of New Jersey, Plaintiff-Appellant,
v.
Nigel REYNOLDS, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued October 1, 1998.
Decided November 6, 1998.
Steven J. Kaflowitz, Assistant Prosecutor, for plaintiff-appellant (Thomas V. Manahan, Union County Prosecutor, attorney; Mr. Kaflowitz, of counsel and on the brief).
Mark A. Rothberg, Short Hills, for defendant-respondent (Wilf and Silverman, attorneys; Mr. Rothberg, on the brief).
Before Judges LANDAU and BRAITHWAITE.
The opinion of the court was delivered by LANDAU, J.A.D.
This is an appeal by the State from the Law Division's grant of a suppression motion during the trial de novo of defendant Nigel *1130 Reynolds's DWI conviction (N.J.S.A. 39:4-50) in Cranford Municipal Court.
The Law Division suppressed evidence inculpatory of defendant based upon a determination that the roadblock which led to his detection and arrest violated his rights under the Fourth Amendment of the United States Constitution and Article 1, ¶ 7 of the New Jersey Constitution. We reverse and remand for completion of the trial de novo.

FACTS
The Cranford Police Department conducted a DWI roadblock in the eastbound lanes of North Avenue near the Garden State Parkway from 10:45 p.m. on Friday, September 27, 1996 until 2:55 a.m. on Saturday, September 28.
The location was chosen by Lieutenant Jerome M. Andrews, the DWI coordinator of the department. The North Avenue location was one of four recommended locations for DWI roadblocks in Cranford. Statistics on DWI arrests in Cranford were also compiled by Lt. Andrews. These statistics were part of a report Andrews submitted to the Cranford Chief of Police recommending locations for future DWI roadblocks. They showed that there were 274 drunk driving arrests on North Avenue in Cranford from January 1, 1986 to January 1, 1996; that DWI arrests on North Avenue constituted 28 percent of all drunk driving arrests in Cranford during that ten-year period; and that more DWI arrests were made on North Avenue than on any other thoroughfare in Cranford. The highest number of arrests for DWI were made on weekend nights and early morning hours.
Several fatalities had occurred in the vicinity of the roadblock, and four Cranford bars were located in the same vicinity.
Andrews was responsible for supervising the roadblock, which was manned by thirteen Cranford police officers, three Cranford auxiliary police officers, and three explorer cadets.
Advance notice of the roadblock was given on a local cable station. There were two road signs. One was placed twenty to twenty-five yards ahead of the stopping point. It read "DWI Checkpoint Ahead." The second was a stop sign at the roadblock entrance, with a reflective legend reading "DWI Checkpoint." Lighting for the roadblock was provided by portable lights, lights from the radio cars at the roadblock, and flares, as well as existing lighting in the area.
The Cranford police have written guidelines for DWI roadblocks. The guidelines specify the procedures to be followed during the operation of the roadblock. Paragraph six specifies that all personnel at the DWI checkpoint are to be briefed on the guidelines prior to start of the checkpoint. Although Officer Wozniak, the point officer who stopped defendant, had never seen the written guidelines, he was able generally to describe the guideline requirements.
Pursuant to the guidelines and the directions of Lt. Andrews, a point officer would stop each incoming vehicle, greet the driver, hand the driver a little bag containing information on drunk driving, and look for signs of intoxication or any other violations of criminal or motor vehicle laws. The point officer was directed to send every tenth vehicle into a secondary area, located along the side of the road out of the flow of traffic. In addition to every tenth vehicle, the point officer was required to send cars to the secondary area if 1) he had probable cause to believe that a vehicle's occupant was in violation of a criminal or motor vehicle law, or 2) he had a reason to suspect that an individual was driving under the influence of alcohol or drugs. The point officer would place a sticker on the windshield of the vehicle indicating the reason the vehicle was sent to the secondary staging area. At the secondary area, other officers would further investigate the matter based on the sticker placed on the windshield of the vehicle.
As commanding officer, Lt. Andrews was authorized to suspend the roadblock if traffic backed up or the manpower level fell below a number deemed safe for operating the roadblock. He suspended the roadblock from *1131 11:45 p.m. on September 27 until 12:30 a.m. for manpower reasons. The roadblock was not suspended at any time due to the backup of traffic.
According to Lt. Andrews' report, 353 cars passed through the roadblock and 116 of those cars were directed into the secondary area for further investigation. Of the 116 diverted vehicles, thirty-five were sent into the secondary staging area because they were the tenth vehicle in the sequence. In addition, twenty-six of the 116 vehicles were sent to the secondary staging area out of sequence based on the detection of an odor of alcohol by the point officer. Three DWI arrests were made, one of those being defendant's arrest.
Defendant entered the roadblock at approximately 1:30 a.m. in a 1992 Nissan pickup. It was not one of the vehicles in the predetermined tenth-car sequence automatically sent to the secondary staging area.
The point officer, Officer Wozniak, explained the roadblock to defendant and asked if he had anything to drink that evening. Defendant answered "no," but in answering, he faced ahead, not looking at Officer Wozniak. During the exchange, Wozniak detected an odor of alcohol emanating from the driver's compartment. Based on the odor and defendant's failure to look at him, Officer Wozniak requested defendant to blow a breath of air in his direction. Defendant blew the breath of air, but directed it forward toward the windshield. Officer Wozniak asked defendant if he understood the question, to which defendant replied "yes". He then asked defendant to "blow right into my face". When defendant blew in his face, the officer detected a strong odor of alcohol on his breath. At this point, Officer Wozniak directed the defendant's automobile to the secondary staging area.
Based upon tests and observations made at the staging area, defendant was arrested. Subsequently administered breathalyzer tests established a .15% reading. Only the propriety and conduct of the roadblock are presently at issue.

The Legal Issues
In light of the above facts, we are entirely satisfied that the roadblock was established in conformity with the guidelines set down in State v. Kirk, 202 N.J.Super. 28, 493 A.2d 1271 (App.Div.1985), and its progeny, State v. Moskal, 246 N.J.Super. 12, 586 A.2d 845 (App.Div.1991); State v. DeCamera, 237 N.J.Super. 380, 568 A.2d 86 (App.Div.1989); State v. Mazurek, 237 N.J.Super. 231, 567 A.2d 277 (App.Div.1989), certif. denied, 121 N.J. 623, 583 A.2d 320 (1990); State v. Barcia, 235 N.J.Super. 311, 562 A.2d 246 (App.Div.1989); State v. Egan, 213 N.J.Super. 133, 516 A.2d 1115 (App.Div.1986). More specifically, we hold that Lt. Andrews, the DWI coordinator for Cranford's Police Department, fulfilled the requirement that roadblocks be established by a command or supervisory authority (State v. Kirk, supra, at 40-41, 493 A.2d 1271); that proper signs were posted, and due advance publication of the roadblock was given on local access television.
The Kirk standards include consideration of whether the roadblock is reasonably "efficacious or productive." This late Friday-early Saturday roadblock led to three drunk driving arrests in a four-hour period at a single location, compared to the two per month, ten year average for North Avenue. Moreover, informational drunk driving literature enhancing public awareness of the gravity of driving under the influence was distributed to drivers in the high-incidence zone, a salutary purpose consistent with public interest. See Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 475 n. 19, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990).
We turn to address several other findings of unconstitutionality which we deem to have been incorrectly identified by the motion judge in his consideration of the manner in which the Cranford roadblock was conducted.
First among these was the conclusion that it is unconstitutional to stop each and every car passing through the roadblock point. A key to constitutionality of a stop is the neutrality of its nature. It has widely been held and recognized, however, that one method of *1132 insuring such neutrality is to stop all traffic. See Delaware v. Prouse, 440 U.S. 648, 663-664, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); State v. Egan, 213 N.J.Super. 133, 135, 516 A.2d 1115 (App.Div.1986); State v. Kirk, supra, at 50, 493 A.2d 1271. See State v. Moskal, supra, at 20, 586 A.2d 845; Michigan Dep't of State Police v. Sitz, supra, at 475, 110 S.Ct. 2481 (in which all motorists were stopped). See also, Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment, § 10.8(d), at 695 n. 119 (3d ed.1996). The stop-each-car technique employed was obviously conceived and executed by Cranford police in an endeavor to comply with applicable authority. It did not violate defendant's Fourth Amendment rights under the Federal Constitution, nor his rights under Art. I ¶ 7 of the New Jersey Constitution, as interpreted by the above authorities.
The motion judge appeared to suggest that the Fourth Amendment precludes police distribution of DWI informational literature at a roadblock stop even if police identify themselves and state that the purpose of the stop is to screen for drivers under the influence of alcohol or drugs. We disagree. Deterrence is a palpably constitutional goal, repeatedly recognized, along with offender apprehension, as an important object of establishing DWI roadblocks. See, e.g., Michigan Dep't of State Police v. Sitz, supra; Orr v. People, 803 P. 2d 509 (Colo.1990). Reinforcement of the deterrence goal, in part through leafleting, is not an unreasonable executive choice, whatever efficacy an individual jurist may personally ascribe to the technique. When done in association with screening of all vehicles stopped, such leafleting violates no constitutional directive, and is a reasonable method for achievement of the driving safety goal of the program. See State v. Moskal, supra, at 20, 586 A.2d 845; State v. DeCamera, 237 N.J.Super. 380, 382, 568 A.2d 86 (App.Div.1989).
We address next the motion judge's factual conclusions that the procedure employed by Cranford police resulted in a traffic back-up that must be considered as a factor in determining whether the roadblock was proper. Our reading of the record discloses no basis for this factual conclusion. To the contrary, Lt. Andrews, the only witness to discuss backups, said there were none, and that when he experienced a brief manpower shortage, the checkpoint was suspended from 11:45 p.m. to 12:30 a.m. The judge's conclusion appears to be based upon his speculation that traffic must have been backed up because 353 cars were stopped during the three and one-half hours of operation. Given these numbers and the large number of persons manning the roadblock, we see no such necessary inference nor do we find any other basis for the inference in the record. Defendant did not introduce evidence of any traffic backups, and did not contest Lt. Andrews' testimony that there were none. See also State v. Moskal, supra, where 495 cars were stopped in a two hour period. Compare the facts in State v. Barcia, 235 N.J.Super. 311, 562 A.2d 246 (App.Div.1989) in which a roadblock concededly tied up traffic for hours, thus resulting in an arbitrary and oppressive imposition upon the public. No such imposition was here involved.
An important aspect of the roadblock is the screening process employed to divert stopped motorists to the secondary staging area. The motion judge concluded that as diversion of defendant's vehicle was not a tenth-car selection, probable cause to believe defendant was under the influence was required under the Cranford guidelines before sending him to the secondary area. He ruled that Officer Wozniak did not have probable cause to believe that defendant was under the influence. There was error in both rulings. First, ¶ 17 of the guidelines provide:
Those drivers suspected, through observation, of driving under the influence of alcohol and/or drugs will also be requested to pull to the second checking location in addition to the predetermined numbered vehicles.
In short, suspicion through observation is sufficient to warrant secondary evaluation *1133 under the Cranford guidelines for alcohol or drug influence. Based upon the strong odor of alcohol emanating from defendant's car, and detected by Wozniak when defendant blew the several breaths requested, there clearly was sufficient "suspicion" to direct defendant to the secondary area. A higher standard need not have been required. United States v. Martinez-Fuerte, 428 U.S. 543, 563, 96 S.Ct. 3074, 49 L.Ed.2d 1116, 1131 (1976). An articulable suspicion of intoxication was present. That suffices to meet the Cranford guidelines and constitutional standards. LaFave, supra, § 10.8(d), at 707. However, given the essentially undisputed facts, i.e., defendant's position behind the wheel (operation), presence of a strong odor of alcohol on his breath, and his initial avoidance of blowing breaths, as requested, towards the officer, we believe that the probable cause standard was also met. See, State v. Malia, 287 N.J.Super. 198, 203, 670 A.2d 1075 (App.Div.1996).
We add that whether Officer Wozniak actually read the Cranford guidelines is of no particular significance. He was briefed on, and was familiar with, its contents, and his actions were consistent therewith. They were, moreover, objectively reasonable in our view.

Conclusion
The order of suppression is reversed. Remanded for completion of the de novo trial.