855 A.2d 17 (2002)
372 N.J.Super. 29
STATE of New Jersey,
v.
Michael A. THOMAS.
State of New Jersey,
v.
Santa I. Campos.
State of New Jersey,
v.
Steven A. DiMaio.
State of New Jersey,
v.
Charles J. Greway, Jr.
State of New Jersey,
v.
Courtney P. Dorshimer.
State of New Jersey,
v.
Louis Kanicki, Jr.
Superior Court of New Jersey, Law Division, Criminal Part, Camden County.
Decided September 17, 2002.
*18 Matthew Spence, Assistant Prosecutor, for the State of New Jersey (Vincent P. Sarubbi, Camden County Prosecutor; Jennifer T. Kelley, Assistant Prosecutor, on the brief).
Evan M. Levow, Lutz, Levow, Costello & Mullen, Cherry Hill, for appellant Thomas.
Daniel Posternock, Moorestown, for appellant Campos.
Harvey M. Beran, for appellant DiMaio.
John A. Ferzetti, Marlton, for appellant Greway, Jr.
Thomas J. Shusted, Jr., Westmont, for appellant Dorshimer.
*19 George R. Saponaro, for appellant Kanicki, Jr.
COOK, J.S.C.
This matter is before the Court on defendants' consolidated appeals of their driving while intoxicated (DWI) convictions in Pennsauken Municipal Court. They challenge the constitutionality of a sobriety checkpoint or roadblock on Thanksgiving Eve 2001, on State Highway Route 70 westbound in Pennsauken, where each was stopped and arrested for drunk driving, and seek suppression of the DWI evidence. Municipal Court Judge Piperno found that the roadblock met constitutional standards and denied defendants' suppression motion.
A trial de novo was conducted by this Court on the evidentiary record below, including the transcript and the exhibits admitted into evidence at the proceedings before Municipal Court Judge Piperno. R. 3:28-8(a). This Court is bound by the evidentiary record before the municipal court, and its function is to determine the case completely anew on the record made by the municipal court, giving due although not necessarily controlling regard to the opportunity of the municipal court judge to assess the credibility of the witnesses. Additionally, the Superior Court Judge must make her or his own findings of fact. Middlesex County Health Dep't v. Importico, 315 N.J.Super. 397, 406, 718 A.2d 727, 723-32 (Law Div.1998) (citations omitted).
Relying on State v. Kirk, 202 N.J.Super. 28, 493 A.2d 1271 (App.Div.1985), and its progeny, defendants asserted below that the roadblock that led to their drunk driving arrests was unconstitutional, and that all evidence related to their driving while intoxicated should be suppressed. After a lengthy hearing consisting of the testimony of Lieutenant Thomas A. Connor, Traffic Division Commander, Pennsauken Police Department, and the introduction of numerous exhibits related to the roadblock, Judge Piperno stated his findings and conclusions and denied defendants' motion. Hence this appeal.
I have read and reviewed the evidentiary record below, including the transcript and the exhibits, as well as the briefs on this appeal, and I have heard and considered the oral arguments of counsel on this appeal. As outlined below, I am entirely satisfied, based on a de novo review of the evidentiary record before the municipal court, that the subject roadblock was constitutional and was established in conformity with the guidelines set forth in State v. Kirk and its offspring, including State v. Reynolds, 319 N.J.Super. 426, 725 A.2d 1129 (App.Div.1998).
Initially, having given due regard to Judge Piperno's opportunity to assess Lieutenant Connor's credibility, and having had the opportunity to review his transcribed testimony, I find Lieutenant Connor's testimony to be fully credible and worthy of belief. It is clear from his responses on direct and cross-examination that he was consistent, he was not argumentative, he gave responsive answers, his testimony was based on personal knowledge, and his testimony bears the ring of truth. No significant dent in the credibility of Lieutenant Connor was made by the defense on cross-examination, nor have the defendants otherwise demonstrated any credibility issue.
Lieutenant Connor testified that, in October 2001, he submitted a written proposal for Thanksgiving Eve 2001 sobriety checkpoints in Pennsauken, including the subject checkpoint at State Highway Route 70 westbound, to his superior, Captain Newman. Lieutenant Connor has worked in the Traffic Division for fourteen years and has been Supervisor of the *20 Traffic Division since 1994. In his written proposal, Exhibit S-1, he referenced State v. Kirk. He noted that previous sobriety checkpoints had been successful on at least four prior occasions; that Thanksgiving Eve was a time of increased alcohol consumption and greater potential for impaired motorists; and that it had yielded significant numbers of DWI arrests. He noted the injuries and deaths associated with DWI, and that a traffic count at the proposed checkpoint, in his words "a well traveled state highway," showed 425 vehicles per hour. He related that four checkpoints on prior Thanksgiving Eves resulted in seventy-seven DWI arrests, over a combined sixteen hour period, or four DWI arrests per hour, versus an average of one DWI arrest every seven hours by roving patrols. Lieutenant Connor observed in his proposal that: "The lesson learned from these prior [sobriety checkpoints] is that the problem of drunk driving on [Thanksgiving Eve] is substantial and worthy of our efforts."
He noted that the Wednesday prior to and the morning of Thanksgiving are traditionally known to produce a large number of DWI arrests, and that the results of previous Thanksgiving Eve sobriety checkpoints on the other state highway running through Pennsauken, State Highway Route 130, supported that conclusion. He then addressed the proposed checkpoints, including the subject checkpointState Highway Route 70 westbound at McClellan Drivedescribing it as "a well travelled State Highway", which "in logistical terms [is] relatively close to a curve in the highway and motorist backup would be closely monitored." Lieutenant Connors further noted:
Each of the locations are suitable for the safety of motorists and officers, and the quick, safe deployment and removal of the checkpoint. Should this proposal be accepted, this officer will prepare the necessary traffic control plan for the site chosen, inclusive of tapers and warning devices. Signage advising of the checkpoint will be used on location. Marked units will be used and officers will wear reflectorized material.
The detail should be comprised of a supervisor and the 8 member Traffic Division supplemented by the 12-8 platoon under the guidance of the first platoon watch commander. A plan concerning the deployment and removal of the checkpoint, neutral and courteous procedures of personnel, arrests and processing of arrest is included and will be disseminated to officers in a roll call at approximately 2200 hours of the 22nd of November. The predetermined procedure will be to briefly detain each automobile and further detain those whose drivers show indicia of DWI. Last year, the average delay was usually less than 2 minutes and those in que [sic] have been largely supportive of our efforts.
Each officer who participates in the operation will be required to submit a report as to their duties during the checkpoint. An after action report of the conduct and results of the checkpoint will be forwarded to your office.
On October 16, 2001, pursuant to instructions of Pennsauken Police Chief John Coffey Lieutenant Connor submitted his Thanksgiving Eve checkpoint proposal to the Camden County Prosecutor. Assistant Prosecutor Ottenberg responded to Lieutenant Connor on November 8, 2001, noting that he had reviewed the proposal, that the Prosecutor's Office was of the opinion "that there is a need for these checkpoints during the upcoming holiday season," and listing the State v. Kirk factors used to assess the reasonableness of a DWI checkpoint in connection with preparation *21 of the final plan. The detailed plan was prepared and distributed to all traffic officers on November 9, 2001. Five units, each consisting of two officers, were assigned to the Thanksgiving Eve sobriety checkpoint operation. The operation was limited to the hours of 10:30 p.m. (roll call) to 3:00 a.m. Safety measures for the protection of motorists and the officers were provided. The officers were directed to separately document their participation and submit a report. Lieutenant Connor reminded each officer that a checkpoint may serve to alarm or even anger some motorists, and so each officer would be held to the usual standards of professionalism and conduct, and was to treat motorists with courtesy and not bear oppressively upon them, without exception. Advance notices of this and as many as five other sobriety checkpoints in other towns in Camden County on Thanksgiving Eve were published in the "Legal Notices" section of the Courier-Post and in the South Jersey edition of the Philadelphia Inquirer.
The Thanksgiving Eve sobriety checkpoint on State Highway Route 70 westbound, a three-lane highway, was conducted by the assigned officers, under Lieutenant Connor's supervision. In his written summary of the operation to Captain Newman, Lieutenant Connor reported that through a traffic control plan, including reflective channeling devices placed on the highway, the three westbound lanes were reduced to one outside lane; that within approximately twenty minutes traffic backed up for a distance that had the potential to cause a hazard in terms of motorists' perception and reaction time; that Lieutenant Connor added a third officer to assist the two officers who were stopping the cars; that Lieutenant Connor directed the officers at the checkpoint to allow 100 cars to pass through and then resume stopping each vehicle, beginning with the 101st vehicle; that from then on there was no more than a few minutes' delay with waiting vehicles no more than 500 feet or so; and that the situation was continually monitored. Lieutenant Connor further reported that visibility was good, the road was dry and the weather clear throughout the operation, and that besides the reflective channeling devices, two signs were placed within the taper area advising motorists of the "mission," and all officers were in uniform and using marked vehicles with overhead lighting. He noted that "[the] public was generally supportive of our efforts"; that each participating officer had filed a report; and that the operation resulted in thirteen DWI charges, plus arrests for outstanding warrants and CDS offenses.
In light of the above facts, I find that the Thanksgiving Eve 2001 sobriety checkpoint roadblock on State Highway Route 70 westbound was established in conformity with the constitutional standards and guidelines enunciated in State v. Kirk, State v. Reynolds; State v. Moskal, 246 N.J.Super. 12, 586 A.2d 845 (App.Div.1991), and the other reported decisions on the subject. It is also important to remember that this past March, in State v. Carty, 170 N.J. 632, 652-54, 790 A.2d 903, 916-17 (2002), the Supreme Court took the occasion to emphasize the validity of roadblocks, checkpoints and the like, that are, as in this case, based on a concern for public safety. Justice Coleman wrote:
"To avoid confusion in attempts to overextend our holding in this case in light of the September 11, 2001 attack on the World Trade Center and the Pentagon, we wish to make clear the limitations of this opinion. This decision does not affect the principles enunciated in various state and federal cases that allow roadblocks, checkpoints, and the *22 like based on a concern for public safety. As does the United States Supreme Court, "we view checkpoint stops in a different light because the subjective intrusion-the generating of concern or even fright on the part of lawful travelers-is appreciably less in the case of a checkpoint stop." United States v. Martinez-Fuerte, 428 U.S. 543, 558 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116 (1976). Additionally,
[f]or Fourth Amendment purposes, we also see insufficient resemblance between sporadic and random stops of individual vehicles making their way through city traffic and those stops occasioned by roadblocks where all vehicles are brought to a halt or to a near halt, and all are subjected to a show of the police power of the community. "At traffic checkpoints the motorist can see that the other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion."
[Delaware v. Prouse, 440 U.S. 648, 657, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660 (1979) (quoting United States v. Ortiz, 422 U.S. 891, 894-95, 95 S.Ct. 2585, 2587, 45 L.Ed.2d 623 (1975)).]
Moreover, the special governmental concerns regarding public safety or national security merit full public cooperation with a constitutionally permissible roadblock or checkpoint.
Under the search and seizure provision of the New Jersey Constitution, Article I, paragraph 7, roadblocks established on a purely discretionary basis are invalid. State v. Kirk, 202 N.J.Super. 28, 38-44, 493 A.2d 1271[, 1276-80] (App.Div.1985). In order to pass muster under our state constitution, a roadblock or checkpoint must be established for a specific need and to achieve a particular purpose at a specific place. Id. at 37, 493 A.2d 1271 [at 1275].
If the roadblock was established by a command or supervisory authority and was carefully targeted to a designated area at a specified time and place based on data justifying the site selection for reasons of public safety and reasonably efficacious or productive law enforcement goals, the road block will likely pass constitutional muster. Other factors which enhanced judicial approval were (1) adequate warnings to avoid frightening the traveling public, (2) advance general publicity designed to deter drunken drivers from getting in cars in the first place, and (3) officially specified neutral and courteous procedures for the intercepting officers to follow when stopping drivers.
[Id. at 40-41, 493 A.2d 1271 at 1277]
Accord State v. Flowers, 328 N.J.Super. 205, 207, 218, 745 A.2d 553[, 554, 560-61] (App.Div.2000) (upholding roadblock designed to detect stolen cars in area with high rate of auto theft by stopping every vehicle); State v. Kadelak, 280 N.J.Super. 349, 377, 655 A.2d 461[, 475] (App.Div.), certif. denied, 141 N.J. 98, 660 A.2d 1197 (1995) (upholding roadblock designed to detect vehicle safety violations by stopping every fifth vehicle and vehicles with obvious safety violations); State v. Barcia, 235 N.J.Super. 311, 316, 318-19, 562 A.2d 246[, 248-49, 250] (App.Div.1989) (invalidating roadblock designed to intercept inter-state drug trafficking as arbitrary and excessive where roadblock caused over one million vehicles to come to complete stop and wait in line for up to four hours). It follows that roadblock or checkpoint stops cannot be designed simply to check for criminal violations, Kirk, supra, 202 N.J.Super. at 55, 493 *23 A.2d 1271 [at 1286-87], and that any car detained for further investigation must be detained on the basis of a reasonable and particularized suspicion that the motorist or vehicle is associated with criminal wrongdoing. State v. Reynolds, 319 N.J.Super. 426, 434, 725 A.2d 1129[, 1133] (App.Div.1998) (finding officer at roadblock had both "articulable suspicion of intoxication" and probable cause that justified sending defendant to secondary area for further sobriety analysis). In general, roadblocks may be justified "based on reasons of public safety and reasonably efficacious or productive law enforcement goals." State v. Mazurek, 237 N.J.Super. 231, 235, 567 A.2d 277 [at 279] (App.Div.1989), certif. denied, 121 N.J. 623, 583 A.2d 320 (1990) (internal quotations omitted). The balance to be struck is whether "the checkpoint advance[s] the public interest to a much greater degree than could be achieved through traditional less intrusive police procedures." Id. at 239, 567 A.2d 277 [at 281]. Likewise, federal courts, in analyzing checkpoints, have adopted a balancing test that involves the gravity of the safety interest, the effectiveness of the checkpoint, and the intrusion on the individual's privacy. Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 448-49, 110 S.Ct. 2481, 2484, 110 L.Ed.2d 412 (1990). Although the United States Supreme Court has approved sobriety checkpoints because of "the magnitude of the drunken driving problem [and] the States' interest in eradicating it," Id. at 451, 110 S.Ct. at 2485, the Court also has stated: We address only the initial stop of each motorist passing through a checkpoint and the associated preliminary questioning and observation by checkpoint officers. Detention of particular motorists for more extensive field sobriety testing may require satisfaction of an individualized suspicion standard.
[Id. at 450-51, 110 S.Ct. at 2485]

Accord Martinez-Fuerte, supra, 428 U.S. at 567, 96 S.Ct. at 3087 (approving highway checkpoints for detecting illegal aliens but stating that "`[A]ny further detention ... must be based on consent or probable cause.' United States v. Brignoni-Ponce, [422 U.S. 873, 882, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975)]."). Where there is no individualized suspicion, as in the case of airport security, federal courts apply the balancing test. See, e.g., United States v. Herzbrun, 723 F.2d 773, 775 (11th Cir.1984) (upholding airport searches "[d]ue to the intense danger of air piracy"); United States v. Edwards, 498 F.2d 496, 500 (2d Cir.1974) (upholding airport searches of carry-on baggage with magnetometers to prevent airplane hijacking and/or bombing where device searched all carry-on baggage). The need to protect public safety today is perhaps even more readily apparent than it was when those cases were decided. Therefore, the holding in the present case is limited in that it pertains to consent searches pursuant to a stop for a traffic infraction. In times of national crisis the jurisprudence of the United States Supreme Court and the federal circuit courts have carved out exceptions to the normal search and seizure protections afforded to Americans. We do not disturb that jurisprudence with our decision today, which rests exclusively on independent state grounds."
More specifically, I find that Lieutenant Connor, the Traffic Division Commander for the Pennsauken Police Department and the officer in charge of sobriety checkpoint operations, fulfilled the requirement that roadblocks be established by a command or supervisory authority, *24 State v. Kirk, supra, 202 N.J.Super. at 40-41, 493 A.2d at 1277; that proper signs were posted and proper traffic and motorist safety procedures were utilized; and that due advance publication of the sobriety checkpoint was given in local newspapers. Further, as stated in State v. Reynolds, supra, 319 N.J.Super. at 431, 725 A.2d at 1131, "[t]he Kirk standards include consideration of whether the roadblock is reasonably `efficacious or productive.'" The Appellate Division noted that consideration was met, because the late Friday-early Saturday roadblock in Reynolds led to three drunk driving arrests in a four-hour period at a single location. Here, the roadblock was quadruply "efficacious or productive," leading as it did to thirteen drunk driving arrests in a four- or five-hour period. Defense counsel's argument that such data is "hindsight" and should not be considered is contrary to both the Reynolds and Kirk decisions. State v. Kirk, supra, 202 N.J.Super. at 46, 493 A.2d at 1281 ("degree of effectiveness of the procedure" is a factor).
Further, defendants' argument that Lieutenant Connor's decision to allow 100 cars to pass to eliminate a temporary backup made this an improper roadblock is without merit. This was a stop-each-car checkpoint, which has widely been upheld as a method of insuring the neutrality of the roadblock. State v. Reynolds, supra, 319 N.J.Super. at 432, 725 A.2d at 1131-32. The fact that 100 cars were let through to eliminate a temporary backup to avoid any hazard and enhance motorist safety does not negate the neutrality of the operation. There were 1,177 vehicles involved, and the passage of 100 vehicles to eliminate any safety hazard, with the stopping of the other 1,077 vehicles, does not invalidate the neutrality of the operation. Defendants rely on State v. Barcia, 235 N.J.Super. 311, 562 A.2d 246 (App.Div.1989), to support their argument. However, Barcia involved a backup of over 1,000,000 vehicles that tied up traffic for up to four hours! Id. at 316, 562 A.2d at 248-49. Here, the backup was of very short duration and was quickly cured by the police. Similarly, defendants' argument that the sobriety checkpoint operation must be immediately terminated whenever a roadblock results in any backup at all is without support in the decisional law.
Defendants' further assertion, that there must be statistical data as to prior DWI arrests, or previous DWI-related accidents or fatalities at the State Highway Route 70 westbound sobriety checkpoint site in order for a proper roadblock there, lacks merit. First, sufficient empirical data was produced by Lieutenant Connor about the sobriety checkpoint site to satisfy the requirement of Kirk that it "was carefully targeted to a designated area at a specified time and place based on data justifying the site selection for reasons of public safety and reasonably efficacious or productive law enforcement goals...." State v. Kirk, supra, 202 N.J.Super. at 40-41, 493 A.2d at 1277. So too, Lieutenant Connor produced sufficient information as to the specified time element, Thanksgiving Eve, including the increased consumption of alcohol and alcohol-related impairment of motorists, injuries and deaths, and the large number of DWI arrests at checkpoints on prior Thanksgiving Eves. As the Appellate Division held in State v. Moskal, supra, 246 N.J.Super. at 16, 586 A.2d at 847, "[i]t need not be shown that the exact spot where a sobriety checkpoint is set up be a cause of accidents or fatalities, just the general location provides public safety and is reasonably efficacious." Here, Lieutenant Connor noted that the entire Township of Pennsauken falls within a three-mile radius of the Cove Road-State Highway Route 130 intersection, that approximately *25 40% of all DWI arrests occur there, that from 1997 to August 2001 there were 1,623 DUI arrests there (40% at the Rt. 130Cove Road intersection would be 650 DUI arrests), and that more than 60 of them involved DWIrelated collisions. Hence, defendants' assertion that specific figures for the nearby Route 70-McClellan Drive intersection were not given is without merit. Ibid. Taking into account the DWI arrest rates, past accident rates, public safety and public awareness considerations expressed by Lieutenant Connor, it is reasonable to conclude that a rational basis existed for selecting the State Highway Route 70 westbound sobriety checkpoint and that the sobriety checkpoint site was reasonably efficacious. State v. Moskal, supra, 246 N.J.Super. at 18, 586 A.2d at 847-48.
Furthermore, the requisite "participation of command or supervisory authority" in selecting the sobriety checkpoint was met by Lieutenant Connor. This was not a situation like that in Kirk or State v. Egan, 213 N.J.Super. 133, 516 A.2d 1115 (App.Div.1986), of simply sending out officers to set up roadblocks when and where they felt like it, without any command participation as to site, time and duration. Rather, Lieutenant Connor meticulously planned it, documented all the bases for its selection, time and duration, and so forth. The fact that Lieutenant Connor also participated in the operation does not negate the command or supervisory authority element at all.
All of the necessary advance publicity and warnings were given. Motorist safety considerations were planned and implemented.
Defendants' further argument that there were too many roadblocks contemplated for Thanksgiving Eve 2001-in five or six towns, including one in Merchantville (an adjoining town) and one in Collingswood (a non-adjoining town)thus creating a "Checkpoint Charlie" situation decried in the opinions cited in Kirk, is also without legal merit. The examples noted in the cases cited in Kirk, supra, 202 N.J.Super. at 54 n. 6, 493 A.2d at 1286 n. 6, involving roadblocks in every town in Kansas or every town on the west coast of Florida, clearly are not relevant here. At most, there were five sobriety checkpoints in all of Camden County and its thirty-seven municipalities on Thanksgiving Eve 2001. There was only one in Pennsauken. There was none at the boundaries of Pennsauken and each neighboring town.
It should be noted that none of the defendants raised any issue below or on this appeal as to a lack of articulable suspicion of intoxication or probable cause.
For all the reasons set forth, I find that the subject roadblock was constitutional and was established and conducted in conformity with the guidelines set forth in Carty; Kirk; Reynolds, and Moskal. This roadblock was established by a command or supervisory authority. It was carefully targeted to a designated area at a specified time and place based on data justifying the site selection for reasons of public safety and reasonably efficacious or productive law enforcement goals. There were adequate warnings to avoid frightening the traveling public, as well as advance general publicity designed to deter drunken drivers from getting in cars in the first place, and officially specified neutral and courteous procedures for the intercepting officers to follow when stopping drivers. Thus, this roadblock passes constitutional muster. State v. Carty, supra, 170 N.J. at 652-53, 790 A.2d at 915-16. Accordingly, defendants' consolidated motions to suppress are denied.
Defendants DiMaio, Campos, Greway and Thomas each entered pleas of guilty to *26 driving while intoxicated in violation of N.J.S.A. 39:4-50(a), conditioned on the outcome of their appeals of Judge Piperno's denial of their suppression motion. Defendant Dorshimer appealed only the denial of the suppression motion, not Judge Piperno's finding him guilty of violating N.J.S.A. 39:4-50(a). Accordingly, in view of the denial of their suppression motions by this Court, Judge Piperno's stay of the sentencing of those defendants is hereby lifted.
A further hearing de novo on defendant Kanicki's appeal of Judge Piperno's finding him guilty of violating N.J.S.A. 39:4-50(a) will be conducted forthwith.