**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0754-20

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ALEJANDRO CRUZ-JUAREZ,

     Defendant-Appellant.

_____

Submitted September 16, 2021 – Decided October 4, 2021

Before Judges Fuentes, Gilson, and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Municipal Appeal No. 20-11.

Hugo Villalobos, attorney for appellant.

Michael H. Robertson, Somerset County Prosecutor, attorney for respondent (Lauren E. Bland, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Alejandro Cruz-Juarez appeals from the October 7, 2020 Law Division order convicting him after a trial de novo of driving while intoxicated (DWI), N.J.S.A. 39:4-50, and driving with an expired driver's license, N.J.S.A. 39:3-10(a). The Law Division judge imposed the same penalties as the municipal court judge, including a two-year loss of license and other mandatory fines and penalties for a second DWI offense.

On appeal, defendant challenges only the DWI conviction, raising the following points for our consideration:

> POINT I
>
> THE OFFICER LACKED REASONABLE ARTICULABLE SUSPICION TO CONDUCT AN INVESTIGATORY STOP AFTER FOLLOWING THE DEFENDANT ON A HUNCH.
>
> POINT II
>
> THE DETENTION, STOP AND SEARCH WAS VOID UNDER N.J. [CONST. ART. I], PAR[A]. 7.
>
> POINT III
>
> INDEPENDENTLY THERE WAS NO PROOF BY A PREPONDERANCE OF THE EVIDENCE THAT PROBABLE CAUSE EXISTED TO ARREST THE DEFENDANT FOR DRIVING WHILE INTOXICATED, (DWI).

A-0754-20

POINT IV

THE ALCOTEST RESULTS WERE NOT RELIABLE AS THE STATE DID NOT PROVE BY CLEAR AND CONVINCING EVIDENCE THAT THE ALCOTEST INSTRUMENT WAS IN GOOD WORKING ORDER, INSPECTED ACCORDING TO PROCEDURE, THE OPERATOR WAS CERTIFIED AND THE TEST WAS ADMINISTERED ACCORDING TO PROCEDURE.

Leading Questions To An Alcotest Operator Who Was Reading From An Unidentified Hearsay Document

Operator Entered The Wrong Time In The Alcotest

The [Twenty-]Minute Observation Of Defendant Was Not Performed And The Alleged Synchronization And Delay Of Time Were Speculation

The Two[-]Minute Lockout Violation Showed The Alcotest Was Not In Good Working Order And Operator Error

Mouthpiece Proper Use Was Planted Via Leading Questions

POINT V

THE DEFENDANT DID NOT GET A FAIR TRIAL BECAUSE THE PROCEDURAL FAILINGS IN THIS TRIAL ESTABLISHED THAT THE "CUMULATIVE IMPACT OF THE ERRORS WAS NOT HARMLESS."

A-0754-20

A. In Violation Of The Defendant's Due Process The Judge Failed To Wait For All The Evidence To Be In Before He Blurted Out Findings Of Fact And Used Evidence That Was Not Provided In The Requested Discovery Contrary To Discovery Demanded, Ordered And Filed Motion In Limine.

B. The Court Erred In Entering The Results Of The Air Report In Evidence Over Defendant's Objection, . . . Before The Foundational Documents Were Offered In Evidence, Before Completing Direct, Before Cross-Examination Of The Alcotest Operator, Before Expert Testimony And Before The Defendant Testified.

C. The Unexplained Destruction Of The Video Was A Denial Of Defendant's Due Process Rights And Prejudiced The Defendant Who Was Unable To Place Before The Trier Of Fact The Best Evidence.

D. The Judge Failed To Control The Trial And The Palpable Mistake Was A Clear Abuse Of Discretion Which Deprived Defendant Of A Fair Trial.

We have considered these arguments in light of the record and applicable legal principles. We reject each of the points raised and affirm substantially for the reasons expressed by the Law Division judge in his cogent written statement of reasons accompanying the October 7, 2020 order.

4

We discern these facts from the record. Shortly before midnight on September 17, 2012, Bound Brook Police Officer Frank Waller was "on routine patrol" when he noticed a "red vehicle" travelling east on Talmage Avenue towards Vosseller Avenue. After following the vehicle in his marked police cruiser, Waller observed the car make a left turn and "nearly [strike] multiple cars . . . before jerking back to the center of the lane." Shortly thereafter, Waller observed the vehicle make "a left [turn] from the right lane."

Based on these observations, Waller conducted a motor vehicle stop and approached the driver, later identified as defendant. When Waller asked defendant for his "license, registration and insurance," defendant responded he "did not have a license." Waller immediately noticed "an odor of alcohol emanating from [defendant's] vehicle and . . . breath." Waller also noticed defendant's "eyes were bloodshot," "watery," and "droopy," and "[h]is speech was slurred." According to Waller, as defendant was retrieving his registration and insurance, his "movements were abnormally slow" while he "fumbl[ed] through documents." Upon further inquiry, defendant was unable to provide his home address or his birthday. When Waller asked defendant "if he had anything to drink," defendant "replied that he had one beer." Sergeant Vito Bet soon

5

A-0754-20

arrived on the scene as backup. Upon arrival, Bet also observed defendant's "bloodshot," "red," and "[w]atery eyes," as well as his "droopy eyelids."

Once Bet arrived, Waller directed defendant to exit the vehicle "to perform sobriety testing." After defendant exited his vehicle, he "seemed . . . a little off balance," reaching towards his car "in an attempt to steady himself." Waller noted defendant was "visibly swaying as he stayed in . . . place" and "his clothing was dirty and . . . mussed." Additionally, Bet noted defendant "did [not] have proper balance, was leaning and swaying." After Waller and defendant proceeded to a "dry and flat" area of the sidewalk, Waller asked defendant "if he had any issues" that would cause a problem for him in performing the tests. Although defendant indicated "he had problems with his knee," Waller did not observe "any physical deformities or imperfections."

As Waller began explaining the field sobriety tests, defendant "stopped [him] and told [him] that he didn't speak English." Up to that point, Waller and defendant had communicated in English. Bet, who was fluent in Spanish, then "asked . . . defendant in Spanish if he would like to do the testing in Spanish." In response, defendant placed "his arms behind his back" and told Waller "just arrest me." After Bet and Waller provided defendant with additional

6

opportunities to complete the tests, defendant "refused to take the field sobriety test."  Instead, defendant repeated "several . . . times 'just lock me up.'"

Based on their training and experience, both Waller and Bet believed defendant was intoxicated.  Waller arrested defendant for driving while intoxicated and transported him to police headquarters for processing.  While in the back of the patrol car, Waller observed defendant's "mood" alternate between "crying" and "indifferen[ce]."  Waller also detected the odor of alcohol in the interior of his patrol car once defendant entered the vehicle.  Upon arrival at headquarters, Waller noted defendant continued to have "trouble walking." After defendant was read the Attorney General's Standard Statement for Motor Vehicle Operators, advising him in Spanish that he was required to submit breath samples for testing to determine alcohol content, or be issued a separate summons for refusing,[1] defendant verbally agreed in English to provide breath samples.

Bound Brook Police Officer Gary Ulmer, a certified Alcotest operator, administered defendant's test.  Ulmer detailed his training and experience as an Alcotest operator and authenticated the foundational documents required under

---

[1]  A "print" version of the statement was provided to defendant while an "audio" recording of the statement was played for defendant from the computer.

State v. Chun, 194 N.J. 54 (2008).[2] Ulmer explained "[t]he Alcotest 7110 is a relatively simple machine . . . you turn it on and you just follow the instructions."

According to Ulmer, after ensuring there were no radios, cell phones or other electronic devices in the processing room, he observed defendant for the required twenty-minute period prior to taking any breath samples. During the twenty-minute observation period, which Ulmer calculated using the clock on the wall,[3] Ulmer confirmed there was no "foreign object . . . com[ing] back into [defendant's] mouth," such as "vomit" or "regurgitat[ion]" of any kind to contaminate the breath test results. After twenty minutes, Ulmer instructed defendant how to blow into the machine to ensure an adequate breath sample. On his first attempt, defendant provided an insufficient sample evidenced by the

---

[2]  The documents included Ulmer's up-to-date Alcotest certification card, the calibration records indicating the Alcotest machine was calibrated within six months of defendant's test, the coordinator's up-to-date certification card attesting to the coordinator's certification to inspect and calibrate Alcotest machines statewide, the New Standard Solution Report documenting that the simulator solution of the Alcotest machine was changed within thirty days of defendant's test, the Certificate of Analysis confirming that the simulator solution was tested and found to be within acceptable tolerances, and the Alcohol Influence Report generated by Ulmer documenting the administration of defendant's test.

[3]  Waller also stated defendant was observed for "[o]ver [twenty] minutes" immediately preceding the administration of the test.

A-0754-20

machine indicating "[m]inimum volume not achieved." Ulmer then changed the mouthpiece and repeated the process. Thereafter, Ulmer obtained two valid breath samples, showing defendant's blood-alcohol content (BAC) was 0.140% for each test. Ulmer changed the mouthpiece before each breath sample.

Waller ultimately issued defendant motor vehicle summonses for DWI, driving without a license, and careless driving, N.J.S.A. 39:4-97.[4]

On June 6, 2019, following a testimonial hearing, the municipal court judge denied defendant's suppression motion, crediting Officer Waller's testimony and finding the officer had a reasonable and articulable suspicion to justify the motor vehicle stop based on his observation of "two motor vehicle infractions." The municipal court trial was conducted on October 17, 2019, during which the State produced Waller, Bet, and Ulmer as witnesses. Defendant produced Herbert Leckie, who was qualified without objection as an expert in the use of the Alcotest. During his testimony, Leckie challenged the reliability of the Alcotest results on various grounds. Numerous documentary exhibits, including the foundational documents, were also admitted into

---

[4] "A person who drives a vehicle carelessly, or without due caution and circumspection, in a manner so as to endanger, or be likely to endanger, a person or property, shall be guilty of careless driving." N.J.S.A. 39:4-97.

evidence. Following the trial, on November 19, 2019,[5] the municipal court judge found defendant guilty of DWI and driving without a license, and merged the careless driving summons into the DWI.

Defendant appealed to the Law Division pursuant to Rule 3:23-1. Following a trial de novo based on the record developed in the municipal court, Judge Michael J. Rogers entered an order on October 7, 2020, finding defendant guilty of DWI and an amended charge of driving with an expired driver's license. In his accompanying statement of reasons, the judge recited at length the governing legal principles. Giving "due" but not "necessarily controlling []　regard to the municipal judge's . . . credibility" findings, Judge Rogers found the officers' testimony "factual, credible, and supported by the record."

---

[5] Although the trial occurred almost seven years after defendant's arrest, nothing in the record credibly explains the reason for the delay. When the parties appeared for a pre-trial conference on February 5, 2019, in response to the municipal court judge's inquiry regarding the delay, defense counsel responded he "[thought defendant] was arrested . . . . by immigration." Throughout the proceedings, defense counsel protested the prosecutor's failure to provide various items in discovery despite counsel's specific request pursuant to State v. Holup, 253 N.J. Super. 320 (App. Div. 1992). The prosecutor responded that given the age of the case, the items were not preserved because there had not been an immediate request. The municipal court judge found it was "unreasonable" to "expect the Bound Brook Police Department to retain records for that length of time." In fact, Bet, who was promoted to Chief of Police by the time defendant's trial was conducted, testified Bound Brook Police Department's retention schedule was sixty-two days.

A-0754-20

Judge Rogers held the motor vehicle stop "was lawful and appropriate" based on Waller's "reasonable [and] articulable suspicion that the driver ha[d] committed a motor vehicle violation." See State v. Atwood, 232 N.J. 433, 444 (2018) ("An officer may stop a motor vehicle only upon 'articulable and reasonable suspicion' that a criminal or motor vehicle violation has occurred."). Specifically, the judge noted Waller testified "he observed defendant's vehicle 'nearly [strike] multiple parked cars . . . before jerking back to the center of the lane'" and "fail[] to follow a marked turning course" by making "a left turn from the right lane."

Regarding the arrest, the judge determined Waller "had probable cause to believe that defendant operated his motor vehicle while under the influence of alcohol." In support, the judge relied "on the officer's observations of defendant's erratic driving, admission of alcohol consumption, and other on-scene observations and indication of intoxication." See State v. Moskal, 246 N.J. Super. 12, 21 (App. Div. 1991) ("[T]he yardstick for making [an] arrest for driving while under the influence of intoxicating liquor . . . is whether the arresting officer 'had reasonable grounds to believe' that the driver was operating a motor vehicle in violation [of N.J.S.A. 39:4-50]." (alteration in original) (quoting Strelecki v. Coan, 97 N.J. Super. 279, 284 (App.Div.1967))).

11

Next, the judge determined the evidence established "defendant's guilt beyond a reasonable doubt of operating a motor vehicle while under the influence of alcohol" to sustain both "an observation case" and "a per se case," "either" of which "may form the basis for a DWI conviction." See State v. Kashi, 360 N.J. Super. 538, 544-45 (App. Div. 2003) (explaining that "the offense of driving while intoxicated" under N.J.S.A. 39:4-50 may be "proved through either of two alternative evidential methods: proof of a defendant's physical condition or proof of a defendant's blood alcohol level").

As to the observation case, the judge found evidence sufficient to establish defendant's guilt "based on the observations and opinion testimony" of Waller and Bet. The judge concluded the observations and opinions of the officers were "grounded in factual evidence," and based on their "training and experience in the detection of motorists operating while under the influence of alcohol."

"In addition to the erratic driving and motor vehicle violations," the judge's opinion recited a detailed list of the officers' other observations: "slurred speech"; "incorrect birthday"; "unable to provide address"; "[o]ff balance while walking"; "visibly swaying"; "[b]loodshot, watery, and droopy eyes"; "[o]dor of alcohol on breath"; "[c]lothing mussed and disheveled"; "[s]low movements"; "fumbling for documents"; "[a]dmitted consuming alcohol prior to operating

motor vehicle"; refusal "to continue field tests"; "patrol car smell[ing] of alcohol" after defendant entered; "alternat[ing]" "demeanor"; and "[t]rouble walking at headquarters." See State v. Federico, 414 N.J. Super. 321, 327 (App. Div. 2010) ("[T]he judge could accept the observations of the police regarding defendant's disheveled appearance, slurred language, watery eyes, and smell of alcohol, and make credibility determinations to conclude defendant was operating the vehicle while intoxicated from drinking alcohol.").

As to the per se case, the judge found "the breath test results [scientifically] reliable and admissible in evidence to prove a per se case beyond a reasonable doubt." In that regard, citing Chun, 194 N.J. at 134, the judge acknowledged "[a]s a precondition for admissibility of Alcotest results, the State must establish by clear and convincing evidence that: (1) the Alcotest was in proper working order and had been 'inspected according to procedure'; (2) 'the operator was certified'; and (3) the operator administered the test 'according to official procedure.'"

Further, the judge noted:

> The third Chun factor requires the Alcotest operator to "wait twenty minutes before collecting a sample to avoid overestimated readings due to residual effects of mouth alcohol," and "observe the test subject for the required twenty-minute period of time to ensure that no alcohol has entered the person's mouth while he

13

or she is awaiting the start of the testing sequence." Chun, 194 N.J. at 79.

> Once the requisite waiting period has elapsed, the testing process can begin. Ibid. First, the device automatically samples room air to check for contaminants; this is commonly known as the blank air test. Chun, 194 N.J. at 80. If the initial test is valid, the machine performs the control test, which measures a standard alcohol solution. Ibid. If that test is also valid, that is, if the device accurately analyzes the standard solution, a second blank air test is performed, after which the operator can obtain a breath sample from a defendant. Ibid. After the defendant provides a sample, the device performs a third blank air test to purge the defendant's sample from the device, and then locks out for a two-minute period. Id. at 81. No less than two minutes thereafter, a second breath sample is taken from the defendant. Id. at 81.

The judge determined "[t]he foundation documents introduced into evidence" by the State "were authenticated" and "demonstrate[d] by clear and convincing evidence that the Alcotest device used in this case was functioning properly and produced accurate breath test results. All procedural safeguards were employed, including the [twenty]-minute observation period, and the mouthpiece changes between the three breath tests." In support, the judge relied on Ulmer's testimony that prior to administering the test, "he observed defendant for the requisite [twenty] minutes." After "defendant provided an insufficient sample" "[o]n the first breath test," Ulmer "changed the mouthpiece" and

14

A-0754-20

administered "[t]wo additional tests" "with a sufficient breath sample," "each test report[ing] a BAC of 0.14%."

The judge expressly considered defendant's expert's contention that because "there was no two-minute lockout between the first failed test for insufficient sample, test [number one], and the first valid breath test, test [number two]," the second test could not "be deemed reliable." In that regard, Leckie posited:

> The problem . . . is . . . [the] potential contamination of that second breath sample, the first valid breath sample could have been contaminated by the air that remained in his mouth because the two-minute lockout was not afforded by the instrument which it should have been according to the protocol that was set up for this instrument in the State of New Jersey.

The judge rejected Leckie's contention as "pure speculation." In support, the judge pointed to Ulmer's testimony that he "followed the prompts on the device" and "[t]he device reported no error concerning a two-minute lockout problem." The judge concluded:

> The court finds the breath test results in this case reliable because the two accepted tests [number two and number three] were each 0.14% BAC. If the first "failed" test resulted in mouth alcohol remaining that affected or elevated the second test results, this would have resulted in the second test result with a higher reported BAC than the third test taken after the required

15

two-minute lockout. It is noteworthy that defendant's expert did not testify that there was a doubt about the validity of the third breath test - only the second test because there was no two-minute lockout between the first failed test and the second test. The Alcotest has built-in safeguards to [e]nsure the production, recording, and reporting of reliable results. The device is self-diagnostic. The device itself will warn the operator of system malfunctions and reports its findings in writing. The real inquiry is to determine whether the Alcotest device was functioning properly not whether there exists a hyper-technical collateral issue that invites guesswork and speculation.

The judge also rejected defendant's reliance on the computer aided dispatch (CAD) reports to undermine Ulmer's compliance with the twenty-minute observation period. The judge stated:

> [Ulmer] testified that he observed the defendant continuously at headquarters for at least [twenty] minutes by using a wall clock. The discrepancy of the times in the CAD reports with this testimony may be attributable to a time entry error, or lack of synchronization of the computer clock that generates CAD times with the wall clock.[6] The court accepts the testimony of [Ulmer]. He was positive that he waited the requisite [twenty]-minute period. The defense expert acknowledged that there is no requirement in Chun or any of the AG guidelines that this [twenty]-minute observation period must be documented. The operator's procedural error of entering the stop time as

---

[6] Significantly, Waller testified the computer for the CAD times was not synchronized with the clock in the police vehicle, the clock on the wall at headquarters, or the internal clock of the Alcotest machine.

opposed to the arrest time is of no moment because the [twenty]-minute observation period was adhered to.

[Citations omitted.]

Finally, the judge rejected defendant's claims he was denied a fair trial, stating:

Defendant raises several arguments alleging that he was denied a fair trial by the municipal court judge, i.e., testimony allowed that was not reflected in the discovery, hearsay evidence introduced (arresting officer reading from his police report), destruction of the video, failure to control the trial, leading questions permitted, etc.

A defendant is entitled to a fair trial, not a perfect trial. State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999) (quoting Ludwak v. U.S., 507 U.S. 929 (1993)[)]. The municipal court judge treated both sides fairly and impartially, and explained all of his rulings.

As for the videotape issue raised by defendant, at the time of trial the case was over seven years old through no fault of the State, and the videotape was long before recorded over per police department policy. The court finds no irregularity in this policy, nor any discovery deficiency on the part of the State.[7]

---

[7] See State v. Hollander, 201 N.J. Super. 453, 479 (App. Div. 1985) (explaining that in determining "whether a due process violation has occurred when there has been either suppression, loss or destruction of physical evidence in a criminal trial," courts should consider "whether there was bad faith or connivance on the part of the government," "whether the evidence suppressed, lost or destroyed was sufficiently material to the defense," and "whether

In this ensuing appeal, defendant renews the arguments explicitly rejected by Judge Rogers, arguing the stop was not supported by the requisite reasonable and articulable suspicion of a traffic violation;[8] his arrest for DWI was not supported by probable cause;[9] his per se conviction was flawed due to non-compliance with the requirements in <u>Chun</u>; and various due process violations based on cumulative procedural errors, including failure to produce discovery, particularly the State's failure to preserve the video from the motor vehicle recorder (MVR).

"Our role in an appeal such as this one is limited, in that we 'consider only the action of the Law Division and not that of the municipal court.'" <u>State v. Adubato</u>, 420 N.J. Super. 167, 175-76 (App. Div. 2011) (quoting <u>State v.</u>

---

defendant was prejudiced by the loss or destruction of the evidence") (citations omitted).

[8] Defendant takes issue with the fact that Waller's observation of the traffic violations occurred after he had followed defendant's vehicle while on routine patrol. However, we find no constitutional significance to that fact in the circumstances of this case and defendant provides no authority mandating a contrary conclusion.

[9] Defendant attempted to undermine Waller's probable cause determination based on his administration of the field sobriety tests. However, as the municipal court judge pointed out, administration of the tests was inconsequential "because [defendant] did [not] take the tests."

<span style="float:right">A-0754-20</span>

Oliveri, 336 N.J. Super. 244, 251 (App. Div. 2001)).  While "[t]he Law Division determination is de novo on the record from the municipal court, [see R.] 3:23-8(a), . . . the Law Division judge must give 'due, although not necessarily controlling, regard to the opportunity of the magistrate to judge the credibility of the witnesses.'"  Id. at 176 (quoting State v. Johnson, 42 N.J. 146, 157 (1964)).

In turn, we consider only whether there is "sufficient credible evidence present in the record" to uphold the findings of the Law Division, not the municipal court.  Johnson, 42 N.J. at 162.  We do not "weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence."  State v. Locurto, 157 N.J. 463, 472 (1999) (quoting State v. Barone, 147 N.J. 599, 615 (1997)) (internal quotation mark omitted).  However, the legal determinations of the Law Division judge are not entitled to any special deference, and we review those decisions de novo.  State v. Ugrovics, 410 N.J. Super. 482, 487-88 (App. Div. 2009).

Here, sufficient credible evidence exists in the record  to support Judge Rogers's finding that the arresting officer had an articulable and reasonable suspicion that defendant committed motor vehicle violations to justify the stop, and probable cause to believe defendant was operating a motor vehicle while under the influence of intoxicating liquor.  Further, there is ample credible

19

evidence in the record to sustain the judge's finding that the State established both an observation and a per se violation of the DWI statute beyond a reasonable doubt. We discern no sound reason or justification for disturbing the judge's findings and legal conclusions and reject defendant's contrary claims, including his claims that he was denied a fair trial. Accordingly, the October 7, 2020 order finding defendant guilty of DWI is affirmed substantially for the reasons expressed in Judge Rogers's written statement of reasons accompanying the order. Any arguments not specifically addressed are without sufficient merit to warrant further discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0754-20